**THE CITY OF TULSA, the Tulsa Metropolitan Utility Authority, Plaintiffs,**

v.

**1. TYSON FOODS, INC., 2. Cobb–Vantress, Inc., 3. Peterson Farms, Inc., 4. Simmons Foods, Inc., 5. Cargill, Inc., 6. George's, Inc., 7. City of Decatur, Arkansas, Defendants.**

**No. 01–CV–0900–EA(C).**

United States District Court, N.D. Oklahoma.

March 14, 2003.

Kenneth N McKinney, Mark D Coldiron, Robert Leslie Roark, McKinney & Stringer PC, Oklahoma City, OK, Roger Brent Blackstock, Patrick Hoyt Kernan, Michael S Linscott, McKinney Stringer PC, Tulsa, OK, for Tulsa, City of, Tulsa Metropolitan Utility, Authority.

R Stratton Taylor, Darrell W Downs, Michael Sean Burrage, Mark H Ramsey, Clinton Derek Russell, Taylor Burrage Foster Mallett, Downs & Ramsey, Claremore, OK, Ruth A Wisener, Conner & Winters PLLC, Fayetteville, AR, Thomas A Mars, Robert W George, Kutak Rock LLP, Fayetteville, AR, Craig Sharkey, Tyson Foods Inc, Springdale, AR, for Tyson Foods, Inc., Cobb–Vantress, Inc.

Robert Joseph Joyce, A Scott McDaniel, Chris A Paul, Joyce Paul & McDaniel PC, Tulsa, OK, Sherry P Bartley, Byron Freeland, Lyn P Pruitt, Mitchell Williams Selig, Little Rock, AR, for Peterson Farms, Inc.

Daniel Richard Funk, Conner & Winters, Tulsa, OK, John R Elrod, Fayetteville, AR, Vicki Bronson, Conner & Winters PLLC, Fayetteville, AR, for Simmons Foods, Inc.

John H Tucker, Colin H Tucker, Theresa Noble Hill, Rhodes Hieronymus Jones Tucker & Gable, Tulsa, OK, for Cargill, Inc.

Richard L Carpenter, Jr, Philip James McGowan, Carpenter Mason & McGowan, Tulsa, OK, Gary V Weeks, James M Graves, Vince Chadick, Bassett Law Firm, Fayetteville, AR, for George's Inc..

Linda C Martin, Audra Katharine Hamilton, Doerner Saunders Daniel & Anderson, Tulsa, OK, Mark R Hayes, Little Rock, AR, for Decatur, City of, Arkansas.

R. Richard Love, III, Conner & Winters, Tulsa, OK, for Arkansas Poultry Federation.

### ORDER

EAGAN, District Judge.

Plaintiffs City of Tulsa and Tulsa Metropolitan Utility Authority (collectively, referred to as "Tulsa") have filed suit against defendant City of Decatur, Arkansas ("Decatur"), a municipal corporation, and corporate defendants in the poultry industry (collectively referred to as "Poultry Defendants")—Tyson Foods, Inc. ("Tyson"), Cobb–Vantress, Inc. ("Cobb–Vantress"), Peterson Farms, Inc. ("Peterson"), Simmons Foods, Inc. ("Simmons"), George's, Inc. ("George's"), and Cargill, Inc.("Cargill"). Tulsa alleges that the acts and omissions of defendants have polluted Lakes Eucha and Spavinaw from which Tulsa draws its water supply. Specifically, excess phosphorus from Poultry Defendants' growers' land application of poultry litter and Peterson's and Decatur's "point source" discharge of wastewater have resulted in "eutrophication" of the lakes, *i.e.,*

high levels of algal production in the lakes, which affect water quality. Tulsa seeks cost recovery and contribution from Poultry Defendants under Sections 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(f); and compensatory and punitive damages for intentional nuisance and trespass claims against Poultry Defendants based on Oklahoma statutory and common law[1] and against Peterson and the City of Decatur ("Decatur") under Arkansas common law; and unjust enrichment claims against Poultry Defendants under Oklahoma law and against Peterson and Decatur for the "point source" discharge pursuant to Arkansas law.

### I. FACTUAL SUMMARY

The City of Tulsa is a municipal corporation and a political subdivision of the State of Oklahoma. The Tulsa Metropolitan Utility Authority ("TMUA") is an Oklahoma public trust established under Okla. Stat. tit. 60, § 176 *et seq.* for the purpose of operating the water supply system for the express benefit of the City of Tulsa, as beneficiary of the Trust.

The municipal water supply system at issue in this lawsuit includes Lake Spavinaw, Lake Eucha, Lake Yahola, and the City of Tulsa Mohawk Water Treatment Plant ("Mohawk"). These bodies of water are referred to collectively as the "Water Supply." Lakes Spavinaw and Eucha are reservoirs which were formed by plaintiffs by building dams on Spavinaw Creek, which receives water from the Eucha/Spavinaw watershed encompassing approximately 415 square miles (the "Watershed"). Tulsa constructed Lake Spavinaw

---

1. At the January 3, 2003 motion hearing, plaintiffs stated they were pursuing their state law claims against Poultry Defendants for the alleged pollution of Tulsa's water supply by the "non-point" land application of poultry litter under Oklahoma law only, and against Peterson and Decatur for the alleged "point source" pollution of the water supply under Arkansas law only.

in 1924. In 1938, the Oklahoma Water Resources Board ("OWRB") issued to the City of Tulsa a Permit, Grant, License and Certificate to use and apply 205 cubic second feet of the waters of Spavinaw Creek for its present and future needs. As water demands grew, Lake Yahola was constructed in 1948. Finally, in response to increasing water needs and requirements of Tulsa and other northeastern Oklahoma residents, Tulsa constructed Lake Eucha in 1952.[2]

Today the water collected in Lake Eucha is discharged directly into Lake Spavinaw where approximately 65–70 million gallons per day are piped directly to Lake Yahola. Water from Lake Yahola is processed at the TMUA-operated Mohawk Water Treatment Plant, from which potable water is furnished to consumers in Tulsa and in northeastern Oklahoma.

Tulsa alleges the Water Supply has been adversely affected by an increase of nutrients—specifically, phosphorus, which has in turn resulted in excessive algae growth. Tulsa contends that the excessive algae growth has caused taste and odor problems with respect to the plaintiffs' Water Supply, and that plaintiffs have incurred and will continue to incur substantial treatment costs and other damages in responding to the taste and odor problems.

The process by which lake water quality is affected through the increase of nutrients is commonly known as "eutrophication." Plaintiffs allege the practices of the Poultry Defendants and Decatur have resulted in the eutrophication of Lakes Eucha and Spavinaw.[3] Specifically, plaintiffs allege that all Poultry Defendants have contributed phosphorus to Lakes Eucha and Spavinaw by virtue of the land application of poultry litter by contract growers located throughout the Watershed with whom the Poultry Defendants have contracted for the raising of poultry. Plaintiffs also allege that Peterson and Decatur have contributed phosphorus to Lakes Eucha and Spavinaw by discharging wastes from Peterson's processing plant through a publicly owned treatment work operated by Decatur.

Elemental phosphorus is a reactive solid which is highly combustible. Its fumes are extremely poisonous, and when it comes in contact with tissues elemental phosphorus will cause severe burns or intense inflammation. However, elemental phosphorus does not occur free in nature, but rather combines with other elements, most commonly oxygen, to form phosphate. Phosphate is found in all living cells, is safe and is vital to life processes. Poultry litter and waste generated by

2. Tulsa was granted an Easement on March 11, 1964 by the Cherokee Tribe of Oklahoma. The Easement conveyed the following rights to the City of Tulsa:

(1) the right to use certain lands for the storage of water impounded by its dam on Spavinaw Creek (Eucha Dam) to the highest elevation (approximately 790 feet above sea level) to which water may be impounded by Eucha Dam;

(2) full and exclusive use and control of said lands below elevation 790 feet above sea level, except as herein provided (exceptions include use by Cherokee Tribe);

(3) use of Eucha Reservoir shall remain under the exclusive control and jurisdiction of the City of Tulsa.

3. Plaintiffs also own and operate a water treatment plant known as AB Jewel which processes water received from Lake Oologah. Lake Oologah receives its water from the Verdigris Watershed which is separate and distinct from the Eucha/Spavinaw Watershed which plaintiffs allege in the instant lawsuit has been adversely affected by the practices of the Poultry Defendants and Decatur. Lake Oolagah is also considered by plaintiffs to be impacted by excess nutrient loading to such an extent that it too is in a state of "eutrophication."

poultry processing operations contain phosphorus in the form of a phosphate compound.

Plaintiffs operate several wastewater treatment facilities in and around Tulsa, including sewer lagoons at Lake Eucha. The Eucha Sewer Lagoons were constructed in approximately 1972 to handle human wastewater generated from the campgrounds and cabins around Lake Eucha as well as from an area trailer park. As originally constructed, the Eucha Sewer Lagoons consisted of a discharging sewer lagoon, whereby human wastewater was temporarily held in a lagoon to allow biological activity to occur prior to the wastewater being discharged by plaintiffs directly into Lake Eucha. On several occasions from 1983 until at least 1991, plaintiffs siphoned or decanted sewage from the Eucha Sewer Lagoons into Lake Eucha. As a result of an investigation into plaintiffs' post–1983 discharges from the Eucha Sewer Lagoons into Lake Eucha, the Oklahoma State Department of Health ("OSDH") determined that the plaintiffs had violated Oklahoma law by discharging wastewater into Lake Eucha without a NPDES Permit. Plaintiffs concede the wastewater discharged from the Eucha Sewer Lagoons from 1972 through 1987 contained phosphates, but argue the amount was *de minimus*. In addition, people continue to use Lake Eucha and Lake Spavinaw for recreational activities such as fishing, boating, and camping.

Plaintiffs produce drinking water from the Water Supply that is in compliance with the Safe Drinking Water Act and does not present health risks to the residents of Tulsa. There is no current threat to plaintiffs' ability to produce safe drinking water from the Water Supply, although plaintiffs contend that the alleged pollution by Poultry Defendants and Decatur, if left unabated, will lead to more severe problems with the Water Supply, including problems of direct consequence to human health.

Poultry Defendants—Tyson, Cobb–Vantress, Simmons, Peterson, Cargill and George's—are in the business of processing and marketing poultry products to consumers. Generally, the Poultry Defendants contract with independent growers for the care and feeding of poultry ("poultry growers") which the Poultry Defendants subsequently process and market to consumers. Some of those poultry growers own and operate poultry farms which are located within the Watershed.

George's estimates its contract growers generated inside the Watershed approximately 1,900 tons of poultry litter in 1998, 1,600 tons in 1999, and 1,600 tons in 2002. In 2002, George's estimated that its growers generated 1,600 tons of litter inside the Watershed. As of September 1, 2002, Peterson admits that its contract growers and company farms have produced approximately 40,715,200 birds and an estimated 39,859 tons of litter in the Watershed. During 2001, Cargill admits that its contract growers produced approximately 810,000 turkeys that generated litter in the Watershed.[4]

---

4. Although plaintiffs are contending that all the Poultry Defendants have raised birds and their growers have applied poultry litter on lands within the Watershed, the Court has included in the fact summary only facts which are not in dispute or supported by admissible evidence. "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2722, at 382–84 (1998); *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896 F.2d 1542 (9th Cir.1989); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187 (5th Cir.1991); *IBP, Inc. v. Mercantile Bank of Topeka*, 6 F.Supp.2d 1258 (D.Kan.1998).

Each Poultry Defendant, or "integrator," conducts an "integrated" poultry raising operation which is characterized by the following elements: (a) each integrator contracts with growers to raise poultry; (b) it delivers small birds to the growers and retains ownership of the birds at all times; (c) it pays the growers a contract rate to grow the poultry; (d) it provides feed and medication to the growers to care for the birds; and (e) it picks up the birds when they mature and processes them at the integrators' processing plants. The vertically integrated poultry operation allows the integrator to control the genetics and the breeding stock that goes into the chickens that are processed; to have consistency in the final product; and to produce the highest quality finished product possible.

The manure generated by the poultry is excreted onto bedding material purchased by the poultry growers (e.g., wood shavings or rice hulls used by poultry growers to line the floors of growing houses). This combination of poultry manure and bedding material is commonly known as "poultry litter." Poultry litter is rich in phosphorus and nitrogen. It has been the practice of poultry growers in the Watershed and elsewhere to spread the poultry litter on the ground, or to sell it or give it away to neighbors as fertilizer.

The poultry industry has been aware since the late 1980s that the land application of poultry litter by contract growers presented a risk of potential environmental impact from nutrient loading resulting from surface water runoff on pastures and fields. The concern was first focused on nitrogen loading and then in the mid to late 1990s, the industry became aware of the potential environmental impact from the phosphorus or phosphates contained in poultry litter.

As early as February 1990, Tyson adopted Dry Poultry Litter Handling Best Management Practices ("BMPs") for its contract growers to educate them about best management practices regarding the storing, land application, and transportation of poultry litter.

In approximately 1999, Peterson held a meeting with its growers to discuss water quality issues in the watershed and litter application. Peterson advised growers that they needed to pay attention to litter application and make sure they applied their litter according to BMBs.

Over the past five years, Cargill claims it has systematically met with its growers in the watershed to provide education, guidance, BMPs, and overall guidance on waste management and disposal practices.

Defendant Decatur is a municipal corporation and a political subdivision of the State of Arkansas. Decatur has approximately 1000–1600 residents. Decatur operates a wastewater treatment plant ("WWTP") to treat wastewater generated by its residents and industry in Decatur.

Defendant Peterson uses this wastewater treatment plant to process poultry waste from its plant in Decatur. Peterson's poultry processing plant in Decatur produces approximately 1.5 million gallons of wastewater per day (not including weekends) which it pre-treats and discharges directly to the Decatur WWTP for final treatment. The phosphorus concentrations in Peterson's effluent range from 9–12 milligrams per liter (mg/L), with an average of 10 mg/L, since the time measurements have been made.

The wastewater that Peterson delivers to the Decatur WWTP constitutes approximately ninety percent of the total volume received and treated by Decatur. Similarly, approximately eighty-five percent of the revenue Decatur receives from the treatment and sale of fresh water comes from Peterson.

Decatur's WWTP is a "point source." A "point source" is defined under the Clean Water Act ("CWA") as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Decatur's wastewater discharge is permitted by the Arkansas Department of Environmental Quality ("ADEQ"), pursuant to its delegated National Pollution Discharge Elimination System ("NPDES") authority from the United States Environmental Protection Agency ("EPA"). "NPDES" is a term of art from the CWA. Pursuant to the CWA, a point source that discharges pollutants may do so only through a permit issued by the EPA (or through the states as delegated and monitored by the EPA) pursuant to the NPDES section of the CWA. *See* 33 U.S.C. § 1311, § 1342. The NPDES permit for Decatur issued by the ADEQ, pursuant to its authority under the EPA, contains no numerical limits for phosphorus. Decatur is required only to monitor and report its discharge periodically. The average phosphorus concentrations in Decatur's discharge to Columbia Hollow Creek, which flows into Spavinaw Creek, is 6–10 mg/L.

Decatur discharges effluent from its WWTP to Columbia Hollow, which disappears underground and reemerges from the ground several miles before it reaches Spavinaw Creek in Arkansas. This is commonly known as a "losing stream." Columbia Hollow flows into Spavinaw Creek and ultimately into Lake Eucha, which is fifteen miles from the point of discharge.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment pursuant to Fed. R.Civ.P. 56 is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Windon Third Oil & Gas v. FDIC,* 805 F.2d 342, 345 (10th Cir.1986). In *Celotex,* the Supreme Court stated:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. 2548.

A party opposing a properly supported motion for summary judgment must offer evidence, in admissible form, of specific facts sufficient to raise a "genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. 2505. Thus, to defeat a summary judgment motion, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Zenith,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. The Court may consider only admissible evidence when ruling on a sum-

mary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.1985). In its review, the Court must construe the evidence and inferences therefrom in a light most favorable to the nonmoving party.

*Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir. 1992).

Before the Court are the following motions for summary judgment:

Dkt. # 211 Poultry Defendants Motion for Summary Judgment or in the Alternative for Partial Summary Judgment and Integrated Original Brief in Support

Dkt. # 216 Separate Defendant Simmons Foods Inc.'s Motion for Summary Judgment

Dkt. # 219 [Peterson's] Motion for Summary Judgment

Dkt. # 225 Plaintiffs' Motion and Brief for Partial Summary Judgment Against Poultry Defendants on Issue of Liability for Growers' Disposal of Poultry Manure

Dkt. # 226 Plaintiffs' Motion and Brief for Partial Summary Judgment Against Poultry Defendants on Issue of Liability Under CERCLA

Dkt. # 229 Separate Defendant George's Inc.'s Motion for Summary Judgment

Dkt. # 232 Separate Defendant Tyson Foods, Inc.'s Motion and Integrated Brief in Support of Summary Judgment

Dkt. # 238 Motion of Separate Defendant Cargill Inc's and Brief in Support of Supplemental Motion for Partial Summary Judgment

Dkt. # 239 Separate Defendant Cobb–Vantress Inc.'s Motion and Integrated Brief in Support of Summary Judgment

Dkt. # 240 Defendant City of Decatur's Motion for Summary Judgment and Brief in Support

Dkt. # 255 Poultry Defendants' . . . Motion and Brief to Strike Plaintiffs' Motion and Brief for Partial Summary Judgment Against Poultry Defendants

As the summary judgment motions include most of the same issues, the Court will address the motions according to issue, rather than motion.

### III. STANDING OF TMUA

■ The Court first addresses whether TMUA has standing to bring this action. To have standing, plaintiffs must have "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical,'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

Poultry Defendants contend TMUA cannot show it has or will sustain an "injury in fact" and therefore lacks standing to bring this action. Specifically, Poultry Defendants assert the costs incurred in the investigation of and formulation of response actions to address the contamination of the Water Supply and in the treatment of the water to make it potable have been borne by the City of Tulsa, and not TMUA, as TMUA has no revenue, employees or expenses.

Plaintiffs dispute that TMUA has no independent source of revenue and that it has not incurred expenses related to this action. Plaintiffs cite TMUA's Lease

Agreement and Operation and Maintenance Contract ("Lease") by which the City leases to TMUA the water and sewer system assets and establishes an operating fund to collect revenues received by TMUA from the sale of treated water. Further, under the Lease, TMUA incurs indebtedness through operation and maintenance expenses for which it is contractually obligated to reimburse the City. Plaintiffs also contend TMUA contracted with the OWRB for evaluation and monitoring services in conjunction with the Spavinaw–Eucha Clean Lake Study which constitutes part of the costs sought in this lawsuit.

Based on the above, the Court cannot find as a matter of law that TMUA lacks standing to bring this action.[5]

## IV. CLAIMS UNDER CERCLA

Plaintiffs seek partial summary judgment on the issue of liability of the Poultry Defendants as responsible parties under CERCLA. (Dkt. # 226). Poultry Defendants also move for partial summary judgment that (1) plaintiffs cannot state a cost recovery claim under § 107(a) of CERCLA; (2) the alleged released phosphate is not a hazardous substance; (3) plaintiffs did not comply with the National Contingency Plan ("NCP") prior to incurring costs; and (4) the alleged offending conduct falls within the "normal application of fertilizer" exclusion. (Dkt. # 211).

### A. Cost Recovery and Contribution

Plaintiffs bring claims for cost recovery under § 107(a) and for contribution under § 113(f) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f), respectively. To establish a *prima facie* case of liability under either section, plaintiffs must prove the following elements:

(1) the defendants are in one of four categories of covered persons;

(2) there has been a release or threatened release of a hazardous substance from a site which is a covered facility;

(3) the release or threatened release caused the plaintiffs to incur costs;

(4) plaintiffs' costs are necessary response costs; and

(5) plaintiffs' response action or cleanup was consistent with the NCP.

42 U.S.C. § 9607(a); *Morrison Ent. v. McShares, Inc.*, 302 F.3d 1127, 1135–36 (10th Cir.2002); *Public Service Co. of Colorado v. Gates Rubber Co.*, 175 F.3d 1177, 1181 n. 5 (10th Cir.1999). "Covered persons" under § 107(a), otherwise known as "potentially responsible parties" or "PRPs," include the following:

(1) the owners and operators of a facility;

(2) any person who at the time of the disposal of the hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

(3) any person who arranged for the treatment or disposal of a hazardous substance at the facility; and

(4) persons who transported hazardous substances to the facility.

*See* 42 U.S.C. § 9607(a).

■ A cost recovery action under § 107(a) imposes strict liability on PRPs for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan [ ('NCP') ] [and] any other necessary costs of response incurred by any other person consistent with the [NCP]." 42 U.S.C. § 9607(a)(4). "It is also well settled that § 107 imposes joint and several liability on PRPs regardless of fault." *United States v. Colorado & Eastern Railroad Co.*, 50 F.3d 1530, 1535 (10th Cir.1995).

---

**5.** For the same reason, the Court denies Poultry Defendants' motion for summary judgment that TMUA is not the real party in interest.

Due to the impossibility of determining the amount of environmental harm caused by each party where wastes of varying and unknown degrees of toxicity and migratory potential have mixed, the courts have been reluctant to apportion costs between PRPs, and hence have adopted the rule that "damages should be apportioned only if the *defendant* can demonstrate that the harm is divisible." *Id.* (quoting *O'Neil v. Picillo,* 883 F.2d 176, 178 (1st Cir.1989)). As the difficult burden of showing divisibility of harm is on the defendant PRP(s) in a cost recovery action, PRPs rarely escape joint and several liability. *Id.; Morrison,* 302 F.3d at 1133 ("[T]he burden rests on a defendant who has only contributed a fraction of the waste to show that the harm from his actions is divisible from the harm caused by the waste of other defendants.").

 To avoid saddling an individual PRP with the entire liability for cost recovery, Congress amended CERCLA in 1986 to recognize a right of contribution which allows "[a]ny person [to] seek contribution from any other person who is liable or potentially liable under section 9607(a) [107(a)] . . . during or following any civil action under . . . section 9607(a)." 42 U.S.C. § 9613(f). Accordingly, under § 113(f), an individual PRP who has in-

curred the entire cost of cleanup of a site may seek contribution from other PRPs. Although § 113(f) does not create a new cause of action and "*is* an action under § 107," liability among the PRPs under § 113(f) is necessarily several, rather than joint and several as in a cost recovery claim under § 107, and is allocated according to equitable factors.[6] *Sun Company, Inc. v. Browning–Ferris, Inc.,* 124 F.3d 1187, 1191 (10th Cir.1997) ("Under CERCLA's statutory scheme, therefore, a PRP's contribution action seeks to recover costs referred to in § 107 . . ., but is governed by the equitable apportionment principles established in § 113(f)"). The burden of proof is on the party seeking apportionment to show that it should be granted. *Colorado & Eastern Railroad,* 50 F.3d at 1536 (citing H.R.Rep. No. 99–253(III), at 19 (1986), reprinted in 1986 U.S.C.C.A.N. 2835, 3038, 3042).

 Poultry Defendants argue that plaintiffs are PRPs because they have operated sewer lagoons at Lake Eucha which discharged human wastewater into the lake from 1972 through 1983, and on several occasions from 1983 until 1991 contributed to the external loading of phosphorus in the lakes by siphoning or decanting sewage from the lagoons into the lake; therefore, as PRPs, plaintiffs cannot bring a cost recovery claim under § 107(a).[7] Al-

---

**6.** Although not an exhaustive or exclusive list, the following "Gore Factors" are considered by many courts in determining apportionment:

(i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(ii) the amount of the hazardous waste involved;

(iii) the degree of toxicity of the hazardous waste involved;

(iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

*Colorado & Eastern Railroad,* 50 F.3d at 1536 n. 5. The district court may consider one or several factors depending on the totality of the circumstances. *Id.* at 1536.

**7.** Although not explicitly stated in the briefs, the Court assumes Poultry Defendants are classifying plaintiffs as "operators" of a facility, as they argue in defense of plaintiffs' com-

though plaintiffs emphasize that their contribution to external phosphorus loading of the lakes is *de minimus*, plaintiffs concede that they are PRPs, and thus under the Tenth Circuit's recent decision in *Morrison Ent. v. McShares, Inc.*, 302 F.3d 1127 (10th Cir.2002), cannot maintain a cost recovery action under § 107(a) of CERCLA. *Id.* at 1135 ("[B]ecause [plaintiff] is a PRP, it may not proceed with two independent suits under both §§ 9607 and 9613(f), but instead may only proceed with an action for contribution under 9613(f).").

In *Morrison,* the Tenth Circuit rejected the landowner plaintiff's "innocent PRP" argument that it should be allowed to bring a cost recovery claim under § 107(a) as it had no responsibility for the contaminating spill at issue. *Id.* at 1134–35. In so finding, the Court declined to follow the Seventh Circuit, which held that a PRP, not entitled to a defense under § 9607(b), could nonetheless proceed under § 107(a) if the PRP is a landowner who is sufficiently innocent. *Id.* at 1134 (citing *NutraSweet Co. v. X–L Eng'g Co.*, 227 F.3d 776, 784 (7th Cir.2000)).

> There may be a superficial attraction to allowing "innocent PRPs" to proceed under § 9607(a). Because these landowners had nothing to do with the release of hazardous waste, it seems reasonable that they should not be forced to bear any of the costs of cleanup whatsoever. Under § 9607(a), if the landowners succeed in showing that the defendants are liable, the entire cost of cleanup would be shifted automatically to the defendants, because they are strictly, jointly, and severally liable. Under 9613(f), on the other hand, even if the landowners succeed in showing that defendants are liable, the landowners face the additional step of dividing liability among the various parties (including, potentially, the plaintiffs) according to equitable factors. Thus, under § 9613(f), there is a theoretical risk that "innocent PRPs" might bear some of the costs of liability. Nonetheless, we see little risk of this result occurring. If the plaintiffs are truly "innocent PRPs," then there should be little difficulty in making the additional required showing that the defendant PRPs should bear the entire cost under the equitable factors. . . .
>
> In addition, it might be unfair to allow "innocent PRPs" to proceed under § 9607 and transfer all of the potential liability to other PRPs because there may be "orphan shares" of liability for bankrupt or judgment-proof defendant PRPs that should be equitably divided among the plaintiffs and other defendant PRPs. . . . Of course, the defendant PRPs may attempt to reimpose that liability on the plaintiff PRPs (or other PRPs) through a new contribution action under § 9613(f), but that result would lead to a "chain reaction of multiple, and unnecessary lawsuits."

*Id.* at 1134–35 (citations omitted).[8]

Given the Tenth Circuit's analysis in *Morrison,* if "innocent PRPs" cannot bring a cost recovery claim under § 107(a), plaintiffs, as admitted "*de minimus*" contributors of phosphorus to Lake Eucha, certainly cannot. However, plaintiffs can

---

mon law claims that plaintiffs are not "owners" of the Water Supply.

**8.** One commentator who disagrees with the "contribution only" analysis for PRPs points out that "innocent PRPs" should be able to bring a § 107(a) claim because they are acting as volunteers in the cleanup and as such cannot bring a contribution action. In addition, not allowing an "innocent PRP" to seek full recovery of response costs does not promote CERCLA's goal to encourage the prompt and voluntary cleanup of hazardous sites. *Michael V. Hernandez, Cost Recovery or Contribution?: Resolving the Controversy over CERCLA Claims Brought by Potentially Responsible Parties,* 21 Harv. Envt'l L.Rev. 83 (1997).

proceed for contribution under § 113(f)(1). Based on the above, the Court grants Poultry Defendants' summary judgment on plaintiffs' § 107(a) CERCLA claim. (Dkt. # 211). The following analysis of CERCLA issues, therefore, pertains only to plaintiffs' contribution claim under § 113(f).

**B. Facility**

█ "Facility" is defined under CERCLA as

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, *pond*, lagoon, *impoundment*, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) *any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located;* but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9) (emphasis added). Plaintiffs rely on subsection (B). Although plaintiffs originally pleaded the "facility" was the Water Supply, plaintiffs propose the entire Watershed be designated as a "facility" because the hazardous substance at issue, phosphorus, is deposited or can be found virtually throughout the Watershed where poultry litter has been land applied by the poultry growers and their neighbors to whom the litter is sold or given away.[9]

Poultry Defendants object that "facility" cannot be so broadly defined, as the Watershed encompasses more than 415 square miles of land and plaintiffs cannot show the presence of phosphates or phosphorus throughout the entire Watershed. Further, although the poultry growers operate farms on various tracts of land within the Watershed, the farms do not comprise a majority of the land in the Watershed. Poultry Defendants urge that plaintiffs' "re-designation" of the facility as the Watershed is simply an attempt to avoid a defect in their CERCLA claim—the lack of a causal nexus between the poultry growers' land application of poultry litter and the alleged contamination of the Water Supply.

█ The definition of "facility" under § 9601(9)(B) is broad enough to include both the initial site where a hazardous substance is disposed of and additional sites to which the substances have migrated following the initial disposal. *Nutrasweet*, 933 F.Supp. at 1418. In *Nutrasweet*, plaintiff sued a neighboring manufacturer that had dumped hazardous substances on its own property which moved by way of surface and ground water onto plaintiff's property. The district court found that hazardous substances came to be located on both the plaintiff's and manufacturer's property and therefore, both met the definition of "facility." *Id.* at 1417–18 and n. 3; *see also U.S. v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir.1998)("The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination.... However, an area that cannot be reasonably or naturally divided into multiple parts or

---

9. More specifically, plaintiffs argue the facility is the "entire Watershed and the water supply system, including all the land where the Poultry Defendants apply their manure and litter, the lakes and creeks which receive the runoff from those pastures and the effluent from Decatur's and Peterson's processing plants, and the final water supply reservoirs which hold water for treatment by the City of Tulsa water treatment plant." Plaintiffs' Summary Judgment Motion on CERCLA, p. 11 (Dkt. # 226). The Court notes, however, that plaintiffs' CERCLA claim for contribution has not been brought against Decatur or Peterson for the effluent from the WWTP or Peterson's processing plant. *See* First Amended Complaint, First Claim for Relief (Dkt. # 93).

functional units should be defined as a single 'facility,' even if it contains parts that are non-contaminated.").

██ Also, contrary to Poultry Defendants' argument, CERCLA does not impose a causation element as a predicate to liability when a defendant falls into one of the classes of liable parties. *Tosco Corp. v. Koch Ind., Inc.*, 216 F.3d 886, 891 (10th Cir.2000) ("To establish liability under § 9613(f), it is sufficient for the plaintiff to establish a connection between a particular defendant and the incurred response costs *vis á vis* the defendant's identification as a responsible person as defined in § 9607(a)."). Neither is it required that the facility be co-extensive with the responsible person's property. *Louisiana–Pacific Corp. v. Beazer Materials & Services, Inc.*, 811 F.Supp. 1421, 1431 (E.D.Ca.1993) ("nothing in CERCLA supports the notion that facility must be defined by or be coextensive with an owner's property lines."); *Nutrasweet*, 933 F.Supp. at 1420. ("Nutrasweet does not have to prove that X–L's release of hazardous waste onto the portion of its own facility adjacent to NutraSweet's property actually and physically migrated and contaminated plaintiff's property; NutraSweet need only show that the release or threatened release of hazardous substances from the facility caused it to incur response costs."); *U.S. v. Hardage*, 761 F.Supp. 1501 (W.D.Okla.1990).

Although the definition of "facility" is expansive enough to include the Watershed within its scope, the factual record before the Court on plaintiffs' motion for partial summary judgment is insufficient. The documents which plaintiffs cite in support of their statement of facts regarding the land application of poultry litter, *i.e.*, the alleged "disposal" of phosphorus, within the Watershed are either unauthenticated documents or responses to interrogatories which at best admit only to the generation of, and not the land application of, poultry litter in the Watershed. Accordingly, the Court cannot make any finding regarding the boundaries of the "facility" at this juncture.

### C. Arranger Liability

██ Plaintiffs contend Poultry Defendants are liable for the costs plaintiffs have incurred in the cleanup of the lakes as they acted as "arrangers" for their growers' "disposal" of phosphorus in the poultry litter into the Watershed. An "arranger" is defined under CERCLA as "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person by any other party or entity, at any facility ..." 42 U.S.C. § 9607(a)(3). Plaintiffs cite the undisputed facts that Poultry Defendants retain ownership of the birds, provide feed and medication and pick up and process the birds when they are ready. They contend Poultry Defendants regularly oversee the growing conditions and have established BMPs to direct their growers as to the application of poultry waste generated by the birds they own, and allow their growers to spread the waste and litter on their own land or to sell it to others in the watershed who apply it to the land.[10]

10. Plaintiffs also argue separate defendant Peterson "arranges for" Decatur to treat and dispose of the wastewater from Peterson's poultry processing plant knowing Decatur's treated effluent contains 6–10 mg/l per day of phosphorus, and whenever Decatur is fined for exceeding its permit limitations on ammonia, suspended solids, and BODs, Peterson reimburses Decatur for the fine. These purported "undisputed" facts are not relevant, however, as plaintiffs have not brought a CERCLA claim against Peterson for the effluent discharge from its plant or the WWTP. Rather, plaintiffs base their CERCLA claim solely on the Poultry Defendants' arranging for the "disposal" of phosphorus through

Poultry Defendants dispute that the poultry litter is owned by them or that they control the growers' land application of litter. They cite their contracts with the growers as undisputed evidence that the manure and wastes generated by poultry while under the care of the growers is vested in the growers and therefore they lack authority to prohibit the growers from land application of litter.

"Arrange for" is not defined under CERCLA, although "disposal" is. "Disposal" includes:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any ... hazardous waste into or on any land or water so that such ... hazardous waste or any constituent thereof may enter the environment ... or [be] discharged into any waters, including ground waters.

42 U.S.C. §§ 6903(3) and 9601(29). As the Tenth Circuit has yet to interpret the phrase "arrange for," the Court looks to the decisions of other circuits. *Mathews v. Dow Chemical Co.*, 947 F.Supp. 1517, 1523 (D.Colo.1996).

The most restrictive interpretation is offered by the Seventh Circuit in *Amcast Ind. Corp. v. Detrex Corp.*, 2 F.3d 746 (7th Cir.1993). In *Amcast,* Elkhart, a copper fittings manufacturer, contended Detrex, the seller of trichloroethylene ("TCE") used in Elkhart's manufacturing process, was liable for the TCE contamination of groundwater at the Elkhart plant due to accidental spills which occurred during the unloading of TCE from trucks owned by Detrex and those of its common carrier, Transport Services, into Elkhart's storage tanks. Focusing exclusively on Detrex's intent in hiring Transport Services to transport its TCE to Elkhart, the Seventh Circuit concluded Detrex was not liable for

the spills which resulted from loadings from Transport Services' trucks, as Detrex did not "arrange for" those accidental "disposals."

Although the statute defines disposal to include spilling, the critical words for present purposes are "arranged for." The words imply intentional action. The only thing that Detrex arranged for Transport Services to do was to deliver TCE to Elkhart's storage tanks. It did not arrange for spilling the stuff on the ground.... [W]hen the shipper is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, he is not a responsible person within the meaning of the statute and if a mishap occurs en route his liability is governed by other legal doctrines.... We conclude that Detrex was liable under [CERCLA] for the spillage from its own trucks ... but not the spillage from the trucks of the common carrier that it hired.

*Id.* at 751. The Seventh Circuit thus narrowly interpreted "arranged for" as requiring evidence of intent to arrange for the disposal of a hazardous substance. *Id.*

The Eighth Circuit, however, looked beyond defendants' characterization of their intent "to determine whether a transaction in fact involves an arrangement for the disposal of a hazardous substance." *U.S. v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir.1989). In *Aceto,* the United States and the State of Iowa alleged the defendant pesticide manufacturers who hired a formulating company to mix and package pesticides for them were liable for cleaning up the formulator's site because defendants owned the pesticides and the generation of pesticide waste was

their growers' land application of poultry litter. First Amended Complaint, First Claim

for Relief (Dkt. # 93).

inherent in the formulation process. *Id.* at 1379. Defendants moved to dismiss, arguing the complaint alleged only an intent to arrange for formulation of the pesticides, not an intent to arrange for disposal of pesticide wastes. *Id.* at 1380.

In interpreting the statutory language, the Eighth Circuit noted the two essential purposes of CERCLA: (1) to provide for prompt and effective responses to the problem of hazardous wastes and (2) to insure responsible parties bear the costs and responsibility for remedying harmful conditions they caused. *Id.* To further the second purpose, the court determined that the allegations that defendant pesticide manufacturers owned the pesticides throughout the formulating process and the formulation was performed for the benefit of the defendants were sufficient to state a claim that the manufacturers "arranged for" the disposal of the wastes generated by that process. *Id.* at 1382 ("Any other decision, under the circumstances of this case, would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA."). *See also U.S. v. Hercules, Inc.,* 247 F.3d 706, 720, 721 (8th Cir.2001) (adopting a "totality of the circumstances" test as to whether the facts of a given case fit within CERCLA's "overwhelmingly remedial scheme," and finding when ownership is lacking, arranger liability "requires either control over, or 'some level of participation in,' activities related to the arrangement of hazardous waste disposal.").

In *South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 407–08 (11th Cir.1996), the Eleventh Circuit affirmed its rejection of a *per se* rule to determine whether a party "arranged for" the disposal of a hazardous substance, noting that courts should instead "focus on all of the facts in a particular case." *Id.* at 407 (citing *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990)). The court found that "[w]hile factors such as a party's knowledge (or lack thereof) of the disposal, ownership of the hazardous substances, and intent are relevant to determining whether there has been an 'arrangement' for disposal, they are not necessarily determinative of liability in every case." *Id.* at 407.

In *Montalvo,* aerial spraying services ("sprayers") hired to spray landowners' crop and pasture land with pesticides were found jointly and severally liable for the cleanup of their airstrip and storage site and sought contribution from the landowners. The sprayers alleged the landowners owned the pesticides which were mixed and loaded onto the planes and should have known spills and rinsing out of the tanks were necessary incidents of the application process. Distinguishing the allegations in *Aceto,* the *Montalvo* court found that it would stretch the meaning of "arranged for" too far to hold the landowners liable.

> Whereas it was possible to infer the chemical manufacturers in *Aceto* knew about the creation of hazardous wastes given the service they were being provided, we cannot infer the Landowners had similar knowledge that spraying their crop and pasture lands with pesticides entailed the spilling of pesticides and draining of contaminated rinse water. Without this knowledge, the Landowners cannot be said to have acquiesced to the Sprayers' disposal of the wastes.

*Id.* at 408–09. Thus, the Eleventh Circuit found the landowners did not arrange for the disposal of the pesticides.

The Court is persuaded that the appropriate analysis of arranger liability is the "case-by-case" approach set forth in *Montalvo. See also Mathews v. Dow Chemical*

*Co.*, 947 F.Supp. 1517, 1525 (D.Colo.1996) (adopting the *Montalvo* test as "most faithful to the statutory language and purposes of CERCLA") and *U.S. v. Friedland*, 173 F.Supp.2d 1077 (D.Colo.2001) (same). Applying the factors therein, the Court cannot determine as a matter of law whether the Poultry Defendants have "arranged for" the disposal of poultry litter. There are fact questions regarding Poultry Defendants' arrangement with their growers, which include ownership, authority to control, and participation in the alleged disposal of poultry waste through land application of poultry litter. Therefore, the Court denies plaintiffs motion for summary judgment on Poultry Defendants' arranger liability.

## D. Hazardous Substance

■ Poultry Defendants seek summary judgment that plaintiffs cannot state a CERCLA claim because they cannot show a release of a "hazardous substance." While Poultry Defendants admit that phosphorus is a hazardous substance under CERCLA, they argue that the pertinent substance in poultry litter is phosphate, which is not a hazardous substance. Plaintiffs counter that the phosphorus is a constituent of phosphate and, therefore, phosphate contains a hazardous substance under CERCLA.

■ A hazardous substance is defined under CERCLA as "any toxic pollutant" listed under 33 U.S.C. § 1317(a) and any hazardous substance under 33 U.S.C. § 1321(b)(2)(A) of the CWA, "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42

U.S.C.A. § 6921]," and includes substances listed under the Clean Air Act, the Resource Conservation and Recovery Act ("RCRA") and § 102 of CERCLA. 42 U.S.C. § 9601(14). A substance is considered hazardous under CERCLA if it falls under § 9601(14) or is listed in the table of CERCLA hazardous substances found at 40 C.F.R. § 302.4. *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1199–1200 (2d Cir. 1992). Phosphorus is listed as a hazardous substance under both the CWA and CERCLA. *See* 40 C.F.R. Table 116.4A pursuant to 33 U.S.C. § 1321(b)(2)(A) of the CWA and 40 C.F.R. Table 302.4, pursuant to CERCLA § 102, 42 U.S.C. § 9602. There is no separate listing for phosphate.

It is undisputed that elemental phosphorus is highly combustible, poisonous and so reactive it does not occur free in nature, and that phosphate is found in all living cells, is safe and vital to life processes. The parties further agree the EPA has designated separate Chemical Abstract Registry Numbers ("CASRN") for phosphorus (7723140) and phosphate (1465442).

Poultry Defendants do not dispute that phosphorus is listed as a hazardous substance under CERCLA and appears in Table 302.4. Rather, they argue there is no listing for "Phosphorus and Compounds" or "phosphates," so the phosphate at issue here is not a hazardous substance, citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3rd Cir.1992).[11] They also cite the fact that the EPA has assigned separate CASRNs for phosphorus (7723140) and for phosphates (14265442) as evidence the EPA did not intend to include phosphates when listing phosphorus. Fi-

**11.** Poultry Defendants contend that *Alcan* stands for the proposition that a listing in Table 302.4 includes broad generic classes of compounds when the listing is in the following format: "Element X and its compound" such as in the generic listings for "Cadmium

and Compounds," "Chromium and Compounds," etc. As phosphorus is not listed as "Phosphorus and Compounds," they argue that phosphate, as a compound of phosphorus, is not included.

nally, they reason elemental phosphorus is a "hazardous" substance while phosphate is a naturally-occurring compound ubiquitous in foods we eat and discard every day.[12]

In *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192 (2d Cir.1992), the Second Circuit affirmed the district court's denial of summary judgment, holding that CERCLA does not exempt municipal waste nor does it exclude household solid waste from its definition of hazardous substance. *Id.* at 1197. The court explained that "[a] substance need only be designated as hazardous under any *one* of the four environmental statutes or under Table 302.4 to be a hazardous substance under CERCLA." *Id.* at 1200 (emphasis in original). Also, "the concentration of hazardous substances in municipal solid waste—regardless of how low a percentage—is not relevant in deciding whether CERCLA liability is incurred." *Id.* The CERCLA statute comprehensively defines hazardous substances, excluding specifically only oil and natural gas, so that

> [m]unicipal waste need not be listed by name—instead of its constituent components—to fall within the Act. For us to consider the whole separate from its hazardous constituent parts would be to engage in semantic sophistry. When a mixture or waste solution contains hazardous substances, that mixture is itself hazardous for purposes of determining CERCLA liability ... Liability under CERCLA depends only on the presence

in any form of listed hazardous substances.

*Id.* at 1201 (citations omitted); *see also B.F. Goodrich v. Betkoski*, 99 F.3d 505, 515–16 (2d Cir.1996) ("It is enough that a mixture or waste solution contain a hazardous substance for that mixture to be deemed hazardous under CERCLA."); *Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1573 (9th Cir.1994)(holding that even if a product is not specifically listed as a hazardous substance, if its components include hazardous substances, the product is regulated by CERCLA); *Eagle–Picher Indus. v. EPA*, 759 F.2d 922, 930–31 (D.C.Cir.1985) (finding that mining wastes and fly ash need not be specifically listed as they contain some hazardous substances).

In *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir.1992), the Third Circuit rejected defendant's argument that its disposed emulsion which contained only trace levels of generic compounds listed in Table 302.4 was not a hazardous substance under CERCLA as it posed "no real threat to the environment." *Id.* at 261–64. Defendant argued the level of hazardous substances in its emulsion was less than that in dirt and the trial court's refusal to read any quantitative requirement of the listed constituents into "hazardous substance" would make "virtually everything in the universe" a hazardous substance.[13] *Id.* at 259–60. In affirming the trial court, the Third Circuit stated:

> "[T]he corporate generator, a non-natural person, has added to what nature has already seen fit to provide for the continued existence of various life forms on this planet; that Congress has enacted laws to limit, and perhaps limit quite severely, additions to nature for the sake of the environment and of life on this planet seems eminently reasonable."

*Alcan*, 964 F.2d at 260.

---

**12.** The plaintiffs refer to defendants' exhibit listing over 1100 food products with phosphorus-containing compounds as the "broccoli exhibit."

**13.** The Third Circuit cited the following passage from *United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531, 538 (N.D.N.Y.1991) with approval:

Alcan's argument, though superficially appealing, is flawed. First, as noted above, the Government responds to "releases" that threaten environmental safety. Thus, it is the *release alone* that must justify the response costs, not the particular waste generated by one given defendant. Here, there is no question but that a release occurred. Second, the fact that a single generator's waste would not in itself justify a response is irrelevant in the multi-generator context, as this would permit a generator to escape liability where the amount of harm it engendered to the environment was minimal, though it was significant when added to other generator's waste. Accordingly, we find that the district court's construction of the statute furthers important environmental goals.

*Id.* at 264.

■ CERCLA is a remedial statute that courts construe liberally to effectuate its broad response and reimbursement goals. *Murtha*, 958 F.2d at 1198; *Alcan*, 964 F.2d at 258. Based on the above cases, the Court concludes the EPA intended to include phosphorus compounds, such as phosphates, in listing phosphorus in Table 302.4. Whether expressed as PO4 or another chemical combination of phosphorus and oxygen, phosphates contain phosphorus. Since elemental phosphorus is highly combustible, poisonous and so reactive that it does not occur free in nature (an undisputed fact in this case), the EPA likely contemplated liability for phosphorus in real, not theoretical, releases.[14] Further, as recognized by the Third

Circuit, a compound does not have to be toxic or be released in any threshold quantity to be classified as a hazardous substance under CERCLA. *Alcan,* 964 F.2d at 261–64. Therefore, the Court finds that the phosphorus contained in poultry litter in the form of phosphate is a hazardous substance under CERCLA.

## E. Consistency With the NCP

■ Compliance with the NCP is an essential element of plaintiffs' § 113(f) claims under CERCLA. *Public Service Co. of Colorado v. Gates Rubber Co.* (*"PSCo"*), 175 F.3d 1177, 1181 (10th Cir. 1999) ("Both [107(a) and 113(f)] claims require compliance with the NCP."); *Country Line Invs. Co. v. Tinney,* 933 F.2d 1508, 1511 (10th Cir.1991) (summary judgment to defendants appropriate when "the undisputed evidence established that [plaintiff's] costs in investigating and closing [a hazardous site] were not incurred 'consistent with the national contingency plan.'"); *United States v. Hardage,* 982 F.2d 1436, 1442 (10th Cir.1992).

■ The NCP is the EPA's guide for a "CERCLA-quality cleanup" and is set forth in 40 C.F.R. § 300.700. *County Line,* 933 F.2d at 1514. The regulations provide: "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in *substantial compliance* with the applicable requirements." 40 C.F.R. § 300.700(c)(3)(i) (emphasis added). NCP requirements are as follows:

14. The Court also notes the discussion of phosphates in cases predating CERCLA which involved local legislation limiting the sale of phosphate detergents. *See e.g., Procter and Gamble Co. v. City of Chicago,* 509 F.2d 69 (7th Cir.1975); *The Soap and Detergent Assoc. v. Clark,* 330 F.Supp. 1218 (S.D.Fla. 1971); *Colgate–Palmolive Co. v. Erie County,* 68 Misc.2d 704, 327 N.Y.S.2d 488 (N.Y.Sup. 1971). These cases recognized the view of the scientific community that "phosphorus" was the limiting nutrient in the eutrophication of water bodies and the reduction of "phosphate" was the "logical starting point for reclamation of the ... surface and underlying water systems." *Clark,* 330 F.Supp. at 1221.

Under § 300.700 ... a response action will be "consistent with the NCP" if the private party substantially fulfils requirements for (1) worker health and safety; (2) documentation of cost recovery; (3) permit requirements; (4) identification of applicable or relevant and appropriate requirements (ARARs): (5) remedial site evaluation; (6) remedial investigation/feasibility study and selection of remedy (RI/FS), and (7) providing "an opportunity for public comment concerning the selection of the response action" which might include preparing a formal community relations plan, ensuring opportunities for public involvement, and disseminating information to the community.

*PSCo.*, 175 F.3d at 1182. The required level of consistency with the NCP depends on whether the response is characterized as a removal or remedial action. *Id.*

Generally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release. In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health. Remedial actions usually cost more and take longer. Elements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed.

*Id.* (citations omitted.).

■ Poultry Defendants contend plaintiffs' response action is remedial in nature and plaintiffs cannot show they have complied with requirements (5) through (7). In support, Poultry Defendants cite the testimony of plaintiffs' expert, Ben Costello, that: (1) he could not identify a specific information repository of which the public was notified and by which it would have had access to the proposed plan and supporting analysis, or any other documenta-

tion with respect to the alleged response action, Exhibit O, p. 227 (Dkt. # 211); (2) to his knowledge, plaintiffs never prepared a written proposed plan identifying their preferred remedial alternative or disseminated to the general public any such plan, Exhibit O, p. 231 (Dkt. # 211); (3) he had not seen plaintiffs' field sampling plan or their quality assurance plan with respect to the response action, Exhibit O, pp. 232–33 (Dkt. # 211); (4) his investigation of plaintiffs' response actions suggests that, at the time plaintiffs were engaging in actions for which they now seek response costs, no one with responsibilities for the alleged "response actions" was endeavoring or seeking to intentionally comply with the detailed and mandatory prerequisites for recovery under CERCLA and the NCP, Exhibit O, p. 234 (Dkt. # 211). Poultry Defendants argue that as a result of these deficiencies, plaintiffs cannot show their response action was consistent with the NCP.

Plaintiffs, on the other hand, assert their response was a removal action and was in "substantial compliance" with the NCP. Because Tulsa and the TMUA are public bodies, their investigation of and response to the pollution of the Water Supply have mandated several opportunities for public access and comment. Specifically, the TMUA meetings pertaining to incurrence of costs to install GAC filters at the Mohawk Treatment Plant on March 8, 2000, to engage the OWRB to study the lake processes, causes of degradation, and available alternatives on August 27, 1997, and to engage Dr. Dan Storm to model phosphorus loading in the Watershed on May 13, 1998, required prior notice and were open to the public. Exhibit G (Dkt. # 273). Taste and odor issues and possible solutions were routinely and extensively discussed at TMUA operations committee meetings which required prior notice and were open to the public. Exhibit H

(Dkt. # 273). Immediately after the Clean Lakes Report was issued by the Oklahoma Corporation Commission ("OCC") in 1997, plaintiffs initiated a Watershed Management Team with three separate working groups to study watershed issues and develop a strategy for addressing them, which involved thirty private and public entities, state and federal government agencies, and academic institutions, including representatives from Tyson, Peterson, Simmons, the Poultry Federation and contract poultry growers. Exhibit I (Dkt. # 273). These working groups met regularly from 1997 through Spring 2001 to discuss all aspects of the watershed issues. Exhibit J (Dkt. # 273). Even if this extensive public involvement were somehow deficient, the direct and pervasive involvement of state regulatory bodies, evidenced by the OCC Clean Lakes Report (Exhibit K) and the OWRB Report of the Eucha/Spavinaw Lake System (Exhibit L) serves as a substantial equivalent. Finally, plaintiffs contend that the OCC Clean Lakes Report and the OWRB Report, as well as a private company study of alternatives in the Analysis of Taste and Odor Occurrences, dated April 1999 (Exhibit M), set forth the substantially equivalent procedures undertaken by plaintiffs for remedial site inspection, feasibility study and selection of remedy.

As the nature of plaintiffs' response action and its degree of compliance with the NCP is in dispute, the Court will reserve ruling on both issues until the completion of the evidence in the bifurcated trial before the Court on plaintiffs' CERCLA claim.

## F. The "Normal Application of Fertilizer" Exclusion

■ A "release" is defined in CERCLA as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ... but excludes ... (D) the normal application of fertilizer." 42 U.S.C. § 9601(22).[15] Poultry Defendants seek summary judgment that the land application of poultry litter is a "normal application of fertilizer." Plaintiffs concede that animal waste may be used as fertilizer under proper circumstances, but argue that the land application of poultry litter by Poultry Defendants' growers exceeds the "normal" application of fertilizer.

■ To effect CERCLA's goals of environmental protection and remediation, the definition of "release" has been broadly construed by courts. *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1152 (1st Cir.1989). Consequently, exceptions from liability under CERCLA are narrowly construed. *See Idaho v. Hanna Mining Co.,* 882 F.2d 392, 396 (9th Cir.1989). The exclusion of fertilizer from the CERCLA definition of "release" is for the *"normal* application of fertilizer." CERCLA itself does not define what a "normal" application of fertilizer is and the Court is unaware of any decision interpreting the exclusion. When

---

**15.** This exclusion is discussed in a Senate Report that attempts to define some of its terms:

Certain feedstocks used to produce fertilizer (nitric acid, sulfuric acid, phosphoric acid, anhydrous ammonia) are hazardous substances as defined by the bill, and certain fertilizer products may be listed as hazardous substances as well.... Under this exclusion, however, the "normal field application" of fertilizer is not a "release" as defined in the bill.... The term "normal field application" means the act of putting fertilizer on crops or cropland, and does not mean any dumping, spilling, or emitting, whether accidental or intentional, in any other place or of significantly greater concentrations or amounts than are beneficial to crops.

S. Rep. No. 96–848, at 46 (1980).

a term is not defined in a statute, the Court "must construe the term in accordance with its ordinary meaning." *United States v. Telluride Co.*, 146 F.3d 1241, 1245 (10th Cir.1998).

Plaintiffs cite the definition of "normal" as "conforming with, adhering to, or constituting a norm, standard, pattern, level or type." American Heritage College Dictionary (3rd ed.1993). This definition is of little assistance to the Court as it is the "norm" which is in dispute. Poultry Defendants contend that the norm is the practice of their growers, while plaintiffs suggest that the norm is poultry litter application which does not exceed a certain level of phosphorus in the soil.

What is clear to the Court is that any interpretation of "normal application of fertilizer" cannot be made out of context. That context is not provided through argument but through evidence. As neither Poultry Defendants nor plaintiffs have offered any evidence in support of their motions for summary judgment on this issue, the Court denies the motions. (Dkt. ## 211 and 226).

## V. COMMON LAW CLAIMS

### A. Nuisance and Trespass

 Tulsa proceeds under theories of nuisance and trespass against defendants. The primary difference between the two tort theories is in the interest protected; the same conduct can result in actionable invasion of both interests. Trespass protects the possessor's interest in exclusive possession of property as it involves "an actual physical invasion of the property of another." *Fairlawn Cemetery Assoc. v. First Presbyterian Church*, 496 P.2d 1185, 1187 (Okla.1972); *Williamson v. Fowler Toyota, Inc.*, 956 P.2d 858, 862 (Okla.1998) ("Trespass involves an actual physical invasion of the real estate of another without the permission of the person lawfully entitled to possession."). Nuisance protects the possessor's interest in the use and enjoyment of the property. In general, "[a] nuisance, public or private, arises where a person uses his own property in such a manner as to cause injury to the property of another." *Fairlawn Cemetery Assoc. v. First Presbyterian Church*, 496 P.2d 1185, 1187 (Okla.1972); *Roberts v. C.F. Adams & Son*, 199 Okla. 369, 184 P.2d 634, 637 (1947) ("Basically, the law with reference to private nuisances is a definition of the dividing line between the right of any owner to use his property as he so desires and the recognition of that right in another."); *Southeast Arkansas Landfill, Inc. v. State of Arkansas*, 313 Ark. 669, 673, 858 S.W.2d 665, 667 (1993) ("Nuisance is defined as conduct by one landowner which unreasonably interferes with the use and enjoyment of the lands of another and includes conduct on property which disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby property."); *Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579, 587 (1999) (same); *Miller v. Jasinski*, 17 Ark.App. 131, 705 S.W.2d 442, 443 (1986) (same).[16]

 A nuisance can be public, private or both. *Gus Blass Dry Goods Co. v. Reinman & Wolfort*, 102 Ark. 287, 143

---

16. In its motion for summary judgment, Decatur contends plaintiffs cannot establish a nuisance claim against it because the Water Supply is in a different state, fifteen miles from Decatur's WWTP, and therefore, not an "adjacent" or "nearby" property. The Arkansas cases cited by Decatur, however, do not require the affected property be adjacent and the Court declines to find a geographical limit to "nearby" property under Arkansas nuisance law which stops at state lines or mile markers. Certainly, if plaintiffs cannot prove the effluent from the WWTP is hydrologically connected to the Water Supply so as to contribute to the phosphorus loading of the lakes, plaintiffs cannot establish a nuisance claim against Decatur.

S.W. 1087, 1089 (1912) ("Any unwarrantable, unreasonable, or unlawful use by a person of his own property, real or personal, whereby it works a special injury to another in the use and enjoyment of his property will constitute a private nuisance. The same wrongful act and wrongful use of one's property may at once constitute both a public and private nuisance."); *City of Ft. Smith v. Western Hide & Fur Co.*, 153 Ark. 99, 239 S.W. 724, 725 (1922) ("If injury results only to a few, on account of the peculiar circumstances, the nuisance is private, and the remedy is confined to those who suffer from the effects of the nuisance. If, on the other hand, the injury or annoyance is sufficient in extent to become common to all persons who may come within its influence, it is of a public nature."). "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." *Union Texas Petroleum Corp. v. Jackson,* 909 P.2d 131, 141 (Okla.App.1995); Okla. Stat. tit. 50, § 2. *See also* Okla. Stat. tit. 27A, § 2–6–105(A) ("It shall be unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state. Any such action is hereby declared to be a public nuisance."). Any other "unlawful interference" with another's use and enjoyment of property is a private nuisance. Okla. Stat. tit. 50, §§ 1 and 3; *Briscoe v. Harper Oil Co.*, 702 P.2d 33, 36 (Okla.1985); *N.C. Corff Partnership, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 294 (Okla.Ct.App.1996).

Tulsa alleges the Poultry Defendants' growers' land application practices and Pe-

terson/Decatur's wastewater effluent have discharged excess phosphorus to the Watershed, thereby resulting in a physical invasion of the lakes (trespass) and interference and impairment of the beneficial uses of the lakes, particularly their use as a municipal water supply (public and private nuisance).[17] Further, Tulsa alleges defendants knew or should have known their phosphorus loading was invading and interfering with plaintiffs' and the public's use of the lakes, and yet knowingly and intentionally continued their "disposal" practices.

### 1. Property Interest

■ Defendants Cargill and Decatur contend Tulsa does not have the requisite interest in property to bring nuisance or trespass claims against defendants, as the State of Oklahoma is the owner of Spavinaw Creek, and thereby the water that flows into Lakes Eucha and Spavinaw. They argue that Tulsa simply has a license for a quantity of water and not even a contractual right to warranty of water quality or clarity.

The Court finds no merit to this argument. First, a water right is considered real property. "Any wrongful and direct interference with the rights of another in the possession of water rights constitutes a trespass or tort. A wrongful interference with rights in respect to waters may also constitute a nuisance." 78 Am.Jur.2d *Waters* § 10. Second, plaintiffs clearly have a possessory interest in the Water Supply sufficient to bring claims of nuisance and trespass. *Nichols v. Mid–Continent Pipe Line Co.*, 933 P.2d 272, 276–78 (Okla.1996). Stream water is "public water and is subject to appropriation for the benefit and welfare of the people of the state as pro-

---

**17.** Tulsa contends it has also been "specially" injured in that it has incurred the cost to

decontaminate the Water Supply.

vided by law." *Messer–Bowers Co. v. Oklahoma ex. rel. Oklahoma Water Resources Board*, 8 P.3d 877, 879 (Okla.2000) (quoting Okla. Stat. tit. 60, § 60). The Oklahoma Water Resource Board (and its predecessor, the Oklahoma Planning and Resources Board, (collectively referred to "OWRB")) is entitled to appropriate water to municipalities or individuals for any "beneficial" use. Okla. Admin. Code § 785:20–1–6 (2000). It is undisputed that the OWRB issued the City of Tulsa a Permit, Grant, License and Certificate to use and apply 205 cubic second feet of the waters of Spavinaw Creek for its present and future needs. Also, the Cherokee Tribe of Oklahoma granted an easement on March 11, 1964 which conveyed the following rights to Tulsa:

(1) the right to use certain lands for the storage of water impounded by its dam on Spavinaw Creek (Eucha Dam) to the highest elevation (approximately 790 feet above sea level) to which water may be impounded by Eucha Dam;

(2) full and exclusive use and control of said lands below elevation 790 feet above sea level, except as herein provided (exceptions include use by Cherokee Tribe);

(3) use of Eucha Reservoir shall remain under the exclusive control and jurisdiction of the City of Tulsa.

Finally, as a municipality, Tulsa may bring a claim of public nuisance on behalf of the municipal users of the Water Supply under the common law and Oklahoma stat-utes. Okla. Stat. tit. 50, §§ 1–3; Okla. Stat. tit. 27A, § 2–6–105; Okla. Stat. tit. 11, §§ 37–115 (A municipality may bring an action for pollution of the municipal water supply.); *N.C. Corff*, 929 P.2d at 295 (finding alleged pollution of water a public nuisance under statutory and common law); *Ozark Poultry Products, Inc. v. Garman*, 251 Ark. 389, 472 S.W.2d 714, 716 (1971); *Western Hide & Fur Co.*, 239 S.W. at 725; Restatement (Second) of Torts § 821C(2)(b) (1965) (In order to enjoin to abate a public nuisance, one must "have authority as a public official or public agency to represent the state or a political subdivision in the matter[.]"). It is in fact Tulsa's responsibility to insure the quality of drinking water for its citizens. *See* Safe Drinking Water Act, 42 U.S.C. §§ 300f–300j.

For these reasons, the Court finds Tulsa has the requisite property interest to bring claims of nuisance and trespass as alleged herein.

**2. Violations of Okla. Stat. tit. 27A, § 2–6–105 and Okla. Stat. tit. 11, § 37–115 and Nuisance *Per Se***

■ Plaintiffs argue the Court should hold as a matter of law that poultry litter is a "pollutant" and that Poultry Defendants' activities through their growers have caused poultry manure to enter the waters of Oklahoma and the Water Supply in violation of Okla. Stat. tit. 27A, § 2–6–105[18] and Okla. Stat. tit. 11, § 37–115,[19]

**18.** As noted above, section 2–6–105(A) provides:

It shall be unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state. Any such action is hereby declared to be a public nuisance.

**19.** Section 37–115 states:

No person, firm, partnership, or corporation, or any of the partners, officers, man-agers, or employees thereof, shall pollute or permit the pollution of the water supply of a municipality, or any stream, pond, spring, lake, or other water reservoir or groundwater aquifer, which is used or which is being held for use as a water supply by a municipality. A municipality may bring an action in the district court to enjoin any activity that will cause pollution of the water supply of a municipality whether or not such activity is regulated, licensed, or inspected. For the purposes of this section, the term pollu-

thus creating a nuisance *per se.* Plaintiffs reason as follows: (1) Poultry Defendants' growers have placed poultry litter on land in the Watershed; (2) the poultry litter has found its way to the Water Supply; (3) animal manure is a "pollutant" under the CWA, 33 U.S.C. § 1362(6), which includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water"; *see also* Okla. Stat. tit. 27A, § 2–6–101(8) (identical definition under Oklahoma's Water Quality Act except the last phrase states "agribusiness waste discharged into waters of the state");[20] (4) it is a violation of Okla. Stat. tit. 27A, § 2–6–105 and Okla. Stat. tit. 11, § 37–115 to pollute or cause pollution of state and municipal waters; and (5) such violations constitute nuisance *per se.*

The Court rejects this argument. Plaintiffs seek to have the Court find *ab initio* what they must prove at trial. Plaintiffs' claim based on the pollution of waters from the land application of litter is a claim of nuisance *per accidens,* or in fact, not *per se.* It is plaintiffs' burden to prove the land application of litter has "become a nuisance by reason of the circumstances, or location or surroundings," including by phosphorus in the litter making its way to and "polluting" the Water Supply. *Town of Lonoke v. Chicago, R.I. & P.R. Co.,* 92 Ark. 546, 123 S.W. 395, 398 (1909); *British–American Oil Producing Co. v.*

*McClain,* 191 Okla. 40, 126 P.2d 530, 532–33 (1942) ("While a particular use may not be a nuisance *per se* it may grow into a nuisance *per accidens.*"); *Western Hide & Fur Co.,* 239 S.W. at 726; *Gus Blass Dry Goods Co.,* 143 S.W. at 1089.

■ Cargill, in fact, argues it is entitled to the opposite presumption—that the land application of poultry litter is reasonable and does not constitute a nuisance, citing Okla. Stat. tit. 50, § 1.1(B). Section 1.1(B) states:

> Agricultural activities conducted on farm or ranch land, if consistent with good agricultural practices and established prior to nearby nonagricultural activities, are presumed to be reasonable and do not constitute a nuisance unless the activity has a substantial adverse affect [sic] on the public health and safety.

Cargill contends this agriculture exception to nuisance applies because the land application of litter is "consistent with good agricultural practices" and has not had a "substantial adverse affect [sic] on the public health and safety."

While the Court agrees the latter is undisputed in the record, the former is not. Further, Poultry Defendants have not shown the land application of poultry litter by its growers was "established prior to the use of the lakes as a municipal water supply." Therefore, the Court cannot find the exception applies as a matter of law.

The Court accordingly denies plaintiffs' motion for summary judgment that the

---

tion means contamination or other alteration of the physical, chemical, or biological properties of any natural waters of the state, or such discharge of any liquid, gaseous, or solid substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to the health, safety, or welfare of the general public, or to domestic, commercial, industrial, agricul-

tural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, or fish or other aquatic life.

**20.** "Pollution," within the meaning of the CWA, is "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water," 33 U.S.C. § 1362 (2003).

land application of poultry litter is a nuisance *per se*, (Dkt. # 225) and Cargill's motion based on the agricultural exception. (Dkt. # 238).

### 3. Liability of Poultry Defendants

■ Plaintiffs' Oklahoma common law claims against the Poultry Defendants (with the exception of Peterson's alleged liability under Arkansas law for effluent from the Decatur WWTP) are based upon Poultry Defendants' vicarious liability as principals or employers of the poultry growers. Poultry Defendants move for summary judgment on liability arguing (1) the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 181 *et seq.*, and the Agriculture Fair Practices Act ("AFPA"), 7 U.S.C. § 2302 *et seq.*, which implicitly preempt Oklahoma law, define the relationship as one of independent contract, and (2) even if there is no preemption, the relationship is one of bailment and as bailors the Poultry Defendants cannot be held liable for the acts or omissions of their bailees. (Dkt. # 211) George's separately moves for summary judgment that the undisputed facts establish the relationship between it and its growers as one of independent contract and, therefore, it cannot be held liable for their acts or omissions. (Dkt. # 230).

Poultry Defendants contend that the PSA and AFPA legislatively define the relationship between the Poultry Defendants and their poultry growers as one of principal/independent contractor. Under the PSA, a "poultry growing arrangement" is

> any growout *contract* .... or other arrangement under which a poultry grower raises and cares for live poultry for delivery, in accord with another's instructions, for slaughter.

7 U.S.C. § 182(9) (emphasis added). "Poultry grower" under the PSA is

> any person engaged in the business of raising and caring for live poultry for slaughter by another, whether the poultry is owned by such person or by another, but not an employee of the owner of such poultry.

7 U.S.C. § 182(8). Likewise, a "handler" under the AFPA means

> any person engaged in the business ... of (1) acquiring agricultural products from producers ... for processing or sale; or (2) grading, packaging, handling, storing, or processing agricultural products received from producers ...; or (3) *contracting* or negotiating contracts or other arrangements, written or oral, with or on behalf of producers ...[21]

7 U.S.C. § 2302(a) (emphasis added). Poultry Defendants argue that these provisions show the PSA and AFPA extensively regulate all aspects of the relationship between contract growers and Poultry Defendants; therefore, any common law analysis of the relationship is impliedly preempted. Further, they contend that preemption is implied because any state common law analysis would stand as an obstacle to congressional objectives to promote vertical integration farming, to support the independent contract grower, and to modernize agriculture. *See Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

The Court does not find implied preemption of the legal definition of the relationship between the Poultry Defendants and their growers under these Acts. Neither Act evinces Congress' intent to completely

---

**21.** Poultry Defendants argue that they are "handlers" and the poultry growers are "producers" under the AFPA. *See* 7 U.S.C. § 2302(a), (b), and (e).

occupy the field of agricultural production and marketing or to foreclose the application of state law. *Adams v. Greeson,* 300 F.2d 555, 557–58 (10th Cir.1962) (The PSA does not alter in whole or part the rights of parties under state law in a transaction where the owner delivers livestock to a purchaser who pays with a worthless check.); *Mich. Canners & Freezers Ass'n v. Agric. Mktg & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) ("The AFPA contains no preemptive language; nor does it reflect a congressional intention to occupy the entire field of agricultural-product marketing."). Neither does Oklahoma common law stand as an obstacle to the objectives of the PSA or AFPA. The purpose of the PSA is to address the problem of "the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys." *Stafford v. Wallace,* 258 U.S. 495, 514–15, 42 S.Ct. 397, 66 L.Ed. 735 (1922). The purpose of the AFPA is to insure that individual farmers "are free to join together voluntarily in cooperative organizations." 7 U.S.C. § 2301. Interpreting the relationship between Poultry Defendants and their poultry growers under Oklahoma law does not frustrate either purpose. *Sig Ellingson & Co. v. DeVries,* 199 F.2d 677, 679 (8th Cir.1952) (The PSA does not supersede state law in determining who is owner of cattle or imposing liability on market agency for selling cattle for principal who is not true owner.); *Philson v. Cold Creek Farms, Inc.,* 947 F.Supp. 197, 203 (E.D.N.C.1996) (state law negligence claim not prohibited by PSA); *Black Hills Packing Co. v. S.D. Stockgrowers Ass'n,* 397 F.Supp. 622, 630 (D.S.D.1975) (PSA does not preempt state inspection laws). In addition, the AFPA expressly provides it "shall not be construed to change or modify existing State law nor to deprive the proper State courts of jurisdiction." 7

U.S.C. § 2305(d). Oklahoma common law, therefore, applies in determining the relationship between the Poultry Defendants and their growers.

Under Oklahoma law, the following factors are considered to determine whether an employer/employee relationship exists:

(a) the nature of the contract between the parties, whether written or oral; (b) the degree of control which, by the agreement, the employer may exercise on the details of the work or the independence enjoyed by the contractor or agent; (c) whether or not the one employed is engaged in a distinct occupation or business and whether he carries on such occupation or business for others; (d) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (e) the skill required in the particular occupation; (f) whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work; (g) the length of time for which the person is employed; (h) the method of payment, whether by the time or by the job; (i) whether or not the work is a part of the regular business of the employer; (j) whether or not the parties believe they are creating the relationship of master and servant; and (k) the right of either to terminate the relationship without liability.

*Page v. Hardy,* 334 P.2d 782, 784–85 (Okla. 1958); *Duncan v. Powers Imports,* 884 P.2d 854, 856 n. 1 (Okla.1994); *Coleman v. J.C. Penney Co.,* 848 P.2d 1158, 1160 (Okla.1993). This determination turns on the facts of a particular case. *Bouziden v. Alfalfa Electric. Coop., Inc.,* 16 P.3d 450, 459 (Okla.2000). A decisive factor is the control exerted by the employer over the work. *Id.*

■ The Court finds that there are fact questions regarding the nature of the relationship between the Poultry Defendants and their poultry growers. Defendant George's contends that the following facts establish that its growers are independent contractors: (1) the contract expressly holds George's harmless for the grower's operation as an "independent contractor" and states the grower and its employees or agents "will not be considered to be employees of [George's] for any purpose whatsoever"; (2) the grower exercises ultimate control over his/her poultry operation; (3) growers can contract with other Poultry Defendants or other agricultural operations; (4) growers own their own farms and poultry houses; (5) each grower operates on a flock-to-flock or other specific term basis; (6) each party has the right to terminate the contract at the end of the term or occurrence of specific conditions; (7) growers are paid by the job or flock, not by salary; (8) Poultry Defendants' primary business is meat processing to supply retail customers but the growers' business is to raise the poultry to provide the meat to be processed and sold.[22] Plaintiffs, however, argue (1) George's determines the number and breed of chicks to be delivered and when they are delivered to the growers; (2) George's provides and determines the feed and medication for the birds; (3) growers must follow the recommended management practices outlined by George's in the raising and feeding of the birds set forth in the Growers Handbook; (4) George's maintains sole ownership of the poultry and supplies furnished under the contract; and (5) the testimony of former growers of Tyson, Peterson and Simmons is that they did not have any independence in determining how to raise the birds. There are clearly genuine issues of material fact which preclude summary judgment on the nature of the relationship between George's and its growers. (Dkt. # 229).

Further, Poultry Defendants cannot escape this factual dispute in characterizing the relationship between the Poultry Defendants and the growers as one of bailor/bailee. The inquiry concerning the extent of control remains. *See Oklahoma Publishing Co. v. Autry,* 463 P.2d 334, 337 (Okla.1969) ("[B]ailor cannot be held responsible to a third person for injuries resulting from his bailee's negligent use of the bailed property, in the absence of any control exercised by the bailor at the time of the negligence."); *Broaddus v. Comm'l Nat'l Bank of Muskogee,* 113 Okla. 10, 237 P. 583, 584 (1925).

■ Plaintiffs argue that the issue of the Poultry Defendants' degree of control over their growers need not go to the jury because the Poultry Defendants are nevertheless liable as a matter of law for any nuisance or trespass caused by the known or foreseeable contract activities of their growers. In support, plaintiffs cite the exception set forth in Restatement (Second) Torts § 427B. Section 427B, titled "Work Likely To Involve Trespass Or Nuisance" (the "exception") states:

One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance.

Comment b to § 427B further explains:

This exception applies to work which involves a trespass on the land of another, or either a public or a private nui-

---

**22.** The Court notes that George's did not refer to the record with particularity in support of its statement of undisputed facts, as required by Local Rule 56.1. Reference to the record in the argument does not meet this requirement.

sance. It applies in particular where the contractor is directed or authorized by the employer to commit such a trespass, or to create such a nuisance, and where the trespass or nuisance is a necessary result of doing the work, as where the construction of a dam will necessarily flood other land. It is not, however, necessary to the application of the rule that the trespass or nuisance be directed or authorized, or that it shall necessarily follow from the work. It is sufficient that the employer has reason to recognize that, in the ordinary course of doing the work in the usual or prescribed manner, the trespass or nuisance is likely to result.

*See also Weinman v. De Palma,* 232 U.S. 571, 576, 34 S.Ct. 370, 58 L.Ed. 733 (1914) ("[T]he 'independent contractor' doctrine [does not] apply where the work that the contractor is to do of itself amounts to a nuisance or necessarily operates to injure or destroy the property of plaintiff."); *Tankersley v. Webster,* 116 Okla. 208, 243 P. 745, 747 (1925) (recognizing the exception " 'that where the performance of [a] contract, in the ordinary mode of doing the work necessarily or naturally results in producing the ... nuisance which caused the injury, then the employer is subject to the same liability to the injured party as the contractor' "); *Shannon v. Mo. Valley Limestone Co.,* 255 Iowa 528, 122 N.W.2d 278, 280–81 (1963) ("This determination assists the limestone company very little. The general rule that the employer or contractee is not liable for the torts of the independent contractor is subject to exceptions. One of the exceptions is where the work contracted to be done is likely to create a nuisance."); *Amoco Pipeline Co. v. Herman Drainage Sys., Inc.,* 212 F.Supp.2d 710, 722–23 (W.D.Mich.2002) (applying the exception to trespass claim); *McQuilken v. A & R Dev. Corp.* 576 F.Supp. 1023, 1033 (E.D.Pa.1983) ("Under § 427B, ownership of the property upon which the nuisance is created is not determinative, nor is the absence of control over the work performed. An employer or contractor is held liable for 'farming out' work which he knows, or has reason to know, will create a nuisance.").

In *Bleeda v. Hickman–Williams,* 44 Mich.App. 29, 205 N.W.2d 85 (1973), defendant Hickman–Williams & Co. ("Hickman") delivered coke to a plant which screened and sized the coke and then shipped the coke to Hickman's customers. A landowner adjoining the coke plant brought a nuisance action against Hickman due to the "obnoxious dust and odors" that emanated from the plant. *Id.* at 86–87. Hickman contended that the plant was an independent contractor and bailee and, as a matter of law, Hickman was not liable for any nuisance caused by the plant. Hickman was the plant's only customer and at all times retained title to the coke. The coke was delivered to the plant on trucks belonging either to third parties or to the plant. The trial court entered summary judgment in Hickman's favor on liability. *Id.* at 87.

In reversing the trial court, the appellate court relied on the § 427B exception. *Id.* at 89. The court reasoned that Hickman knew how the plant conducted its operations; the methods used were the methods in contemplation of the parties at the time of contracting; when Hickman delivered the coke, it knew it would be sized in the manner used, and knew "for some time the method customarily used and the extent of the damage, if any, caused the plaintiffs." *Id.* at 90.

According to the plaintiffs, the undisputed facts establish that the Poultry Defendants knew that their growers, in the ordinary course of their work for Poultry Defendants, spread poultry litter on the land in the Watershed, and knew or should have known no later than 1996 that their growers' land application of litter

was a primary source of the excess phosphorus causing the degradation of plaintiffs' Water Supply. Once the Poultry Defendants had such notice, they had a duty to suppress or abate the nuisance, which they have not done. *See Shannon v. Mo. Valley Limestone Co.,* 255 Iowa 528, 122 N.W.2d 278, 280 (1963). Therefore, the Poultry Defendants are liable for any trespass or nuisance created by their growers because they were aware or should have been aware that in the ordinary course of doing the contract work a trespass or nuisance was likely to result. *Bleeda,* 205 N.W.2d at 89 ("[A]n employer or contractor who farms out work and who knows or has reason to know that it will create a nuisance is subject to liability for the harm caused others by the nuisance.").

Poultry Defendants agree that the exception states that where the work actually performed is a nuisance or injures or destroys the property of another, the principal can be liable.[23] However, the work actually performed under the contract is "growing chickens" which does not inherently result in any nuisance; "it is not until after the contract growers have completed their work (i.e., growing chickens) that the alleged nuisance could potentially arise." Poultry Defendants' Response at 18 (Dkt. # 255). The growers exercise exclusive ownership and control of the litter and Poultry Defendants have a right to assume the growers will make use of litter in a manner consistent with applicable law. Further, Poultry Defendants assert that they "were not aware until the 1990s that phosphorus presented potential problems to the Watershed," and at that point, took "tangible, reasonable steps" to educate growers about litter management issues to prevent and abate phosphorus concerns within the limits allowed by their contracts with the growers. Poultry Defendants' Response at 22 (Dkt. # 255).

The Court concludes that the exception applies in this case. Poultry waste "necessarily follows" from the "growing" of poultry. *See Bleeda,* 205 N.W.2d at 89. Although Poultry Defendants cite other sources of phosphorus in the Watershed, they admit in their response brief that they were aware in the 1990s that "phosphorus presented potential problems to the Watershed" and, therefore, attempted to address the problem by educating their growers regarding better litter management. Given these admissions, the Court finds Poultry Defendants had "reason to recognize that, in the ordinary course of [the growers] doing the work in the usual or prescribed manner, the trespass or nuisance is likely to result." [24] Restatement (Second) Torts § 427B, cmt. b (1965); *Tankersley,* 243 P. at 747. As the Court concludes that the § 427B exception applies herein, the factual questions regarding the Poultry Defendants' degree of control over their growers need not be addressed at the jury trial.[25] Accordingly,

---

**23.** Poultry Defendants move to strike plaintiffs' motion based on the exception, as plaintiffs added this new theory of liability after discovery was closed. They contend that additional discovery is necessary "regarding the scientific aspects of the argument and the validity inquiries into the remote authorities relied upon by the plaintiffs regarding their argument." The Court denies the motion to strike (Dkt. # 255). The Court is at a loss as to what "scientific aspects" and "validity inquiries" this theory creates which further discovery would have informed.

**24.** The Court emphasizes it is not finding that a trespass or nuisance occurred from the growers' land application of litter. Those are questions for the jury to decide.

**25.** The degree of Poultry Defendants' control, however, remains a factor for the Court to determine in assessing the Poultry Defendants' liability as "arrangers" under CERCLA.

the Court grants plaintiffs' motion for partial summary judgment on the issue of the Poultry Defendants' vicarious liability for any trespass or nuisance created by their growers because they were aware that in the ordinary course of doing the contract work, a trespass or nuisance was likely to result. (Dkt. # 225).

### 4. Causation and Indivisible Harm

 Poultry Defendants seek summary judgment that plaintiffs cannot prove causation as they cannot quantify the impact on the Watershed caused by the land application of poultry litter by each Poultry Defendant. (Dkt. ## 211, 216, 232, 239). Plaintiffs concede that they cannot apportion the harm or the damages among the defendants. However, they contend that where intentional tortious acts of several defendants combine to cause an indivisible harm as here, they are not required to prove the particular harm or damages caused by a particular defendant, and defendants are jointly and severally liable for the damages from that harm.[26]

 The injury alleged herein is a single, indivisible injury—the eutrophication of the lakes from excess phosphorus loading. Under Oklahoma and Arkansas law, regardless of whether the claim is one of negligence or intentional tort, where there are multiple tortfeasors and the separate and independent acts of codefendants "concurred, commingled and combined" to produce a single indivisible injury for which damages are sought, each defendant may be liable even though his/her acts alone might not have been a sufficient cause of the injury. *Boyles v. Oklahoma Natural Gas Co.*, 619 P.2d 613, 617 (Okla.

1980) (negligence); *Bode v. Clark Equipment Co.*, 719 P.2d 824, 827 (Okla.1986) (comparative negligence); *McGraw v. Weeks*, 326 Ark. 285, 930 S.W.2d 365, 367–68 (1996) (negligence).

In *Boyles*, the Oklahoma Supreme Court affirmed that comparative negligence principles do not apply when a blameless plaintiff seeks recovery from multiple tortfeasors whose negligence allegedly "concurred, commingled and combined" to produce the harm. 619 P.2d at 616. In *Boyles*, an injured passerby sued defendants to recover damages for injuries he sustained from a gas explosion in a vacant building. The defendants appealed the trial court's refusal to instruct the jury to assess the percentage of negligence of each defendant. In affirming the trial court, the Court reasoned:

> In the instant case there was but a single injury. Implicit in the jury's verdict is its finding that the separate and independent acts of negligence on the part of the codefendants concurred and combined to produce the harmful result for which damages were sought. Even though concert among the tortfeasors was lacking and the act of one codefendant alone may not have brought about the result, each is at common law responsible for the entire damage.

*Id.* at 617 (footnote omitted).

This reasoning has been repeatedly applied by Oklahoma courts in pollution cases. In *Union Texas Petroleum Corp. v. Jackson*, 909 P.2d 131, 149–50 (Okla. App.1995), the Oklahoma Court of Civil Appeals held that defendants were jointly

---

**26.** Decatur also moves for summary judgment that plaintiffs cannot establish that they have suffered harm that was certain, substantial and not speculative, as the Water Supply is in full compliance with the Safe Drinking Water Act and does not present any health hazards. (Dkt. # 240). The Court denies the motion.

To succeed on their common law claims, plaintiffs are not required to show defendants created a health hazard. Plaintiffs assert that defendants' actions affected the quality of the Water Supply, which required plaintiffs to incur costs in assessment and treatment of the Water Supply.

and severally liable for saltwater contamination of the aquifer which constituted the municipal water supply.

The single, indivisible injury at issue in this case is the contamination of the town of Cyril's water supply by saltwater used in oil and gas operations. The general rule is that where several persons are guilty of separate and independent acts of negligence which combine to produce directly a single injury, the courts will not attempt to apportion the damage, especially where it is impracticable to do so, but will hold each joint tort-feasor liable for the entire result. To make tortfeasors jointly liable, there must be a single injury, there must be community in the wrongdoing and the injury must be in some way due to their joint work. It is not necessary that they be acting together or in concert if their concurring wrongful acts occasion the injury.

*Id.* at 149–50 (citations omitted); *see also Harper–Turner Oil Co. v. Bridge,* 311 P.2d 947, 950–51 (Okla.1957) (finding circumstantial evidence of contamination of water well by oil well located 233 feet from the water well sufficient to submit to jury on causation).[27]

In *Prairie Oil & Gas Co. v. Laskey,* 173 Okla. 48, 46 P.2d 484 (1935), the plaintiff landowner sued two oil and gas companies whose leases ran "wild" at separate times about a month apart for damage to a stream and trees on her land. *Id.* at 485–86. Rejecting the defendants' argument that they should not be held jointly liable because the leases ran wild at different times on different tracts and there was no

common design or concert of action, the Oklahoma Supreme Court found the following evidence sufficient:

The evidence shows that oil escaped from the Sudik lease operated by the defendant Indian Territory Illuminating Oil Company all over the area and drained into Crutcho creek, and that oil escaped from the Sigmon lease operated by the Prairie Oil & Gas Company all over the area and drained into Crutcho creek, which creek ran through plaintiff's farm, and said creek on plaintiff's farm became polluted with oil, and a number of trees along said creek on plaintiff's farm died by reason thereof. The separate acts of said defendants in permitting oil to escape from their leases combined to cause the damage to Crutcho creek that ran through plaintiff's farm, and combined to cause the damage to the trees on plaintiff's land, and each is responsible for the entire damage.

*Id.* at 485–86 (citation omitted). In so finding, the court cited the rule of concurrent negligence:

If concurrent negligence of two or more persons combined together results in an injury to a third person, they are jointly and severally liable and the injured person may recover from either or all; the concurring negligence of one is no excuse or defense to another; each is liable for the whole; even though another was equally culpable, or contributed in a greater degree to the injury; no consideration is to be given to the comparative degree of negligence or culpability, or the degree of care owing; and further

---

27. Poultry Defendants argue that this case is distinguishable from *Union Texas* because poultry litter is only one of many sources of phosphorus in the Watershed, and the offending litter application occurs on land distant from the Water Supply. However, in *Union Texas,* the ALJ made the finding that the "weight of the evidence showed there was no

way to determine what amount of contamination came from any particular source." *Id.* at 136. The ALJ cited "three primary sources of contamination"—land spreading of produced saltwater, operation of unlined saltwater evaporative pits, and oil companies' excess injection rates. *Id.*

inquiry as to proximate cause is not pertinent.

*Id.* at 486.

In *Northup v. Eakes*, 72 Okla. 66, 178 P. 266 (1919), the Oklahoma Supreme Court held that defendant owners of separate oil and gas leases were jointly and severally liable for the loss of plaintiff's barn which ignited from crude oil which flowed into the creek near the barn. *Id.* at 269. Citing the general rule that when separate acts of negligence combine to produce a single injury, each tortfeasor is responsible for the entire result and no concert of action need be shown, the Court held:

> [a]pplying this principle to the facts disclosed by the record, it is clear that while the lessees holding separate leases acted independent of each other, yet their several acts in permitting the oil to flow into the stream combined to produce but a single injury. In these circumstances each is responsible for the entire result, even though his act or neglect alone might not have caused it.

*Id.* at 268.

This rule is also recognized under Arkansas law. In *McGraw v. Weeks*, 326 Ark. 285, 930 S.W.2d 365 (1996), the Arkansas Supreme Court affirmed the trial court's finding that the damage to plaintiff's cotton crop from pesticides which drifted from neighboring properties to the plaintiff's land was impossible to apportion and that defendants were jointly and severally liable. (The jury had found one defendant 75% and another 25% at fault for the harm). *Id.* at 368. The trial court found that "even though each tortfeasor's act of negligence might not have caused all of the damage, they combined to produce, for the most part, a single injury, and each was responsible for the entire result." *Id.* at 367. The Arkansas Supreme Court rejected defendant's arguments on appeal that the harm was divisible and plaintiff had to show tortfeasors were acting in concert for joint and several liability to attach. The Court affirmed that the harm was indivisible: "the damage to [plaintiff's] cotton crop was the result of the acts of both [tortfeasors] in negligently applying [pesticide] and the trial court ruled that it was impossible to determine in what proportion each contributed to the damages." *Id.* at 368. The Court also found that "[i]n this State, joint and several liability is measured by impact, and where there is a single injury, it does not matter whether the individual acts alone would not have caused the entire result." *Id.* at 367.

As in the instant case, the above cases involve separate acts of multiple defendants allegedly combining to cause an indivisible harm. In none of the cases is the plaintiff required to prove the portion of the harm that was caused by each defendant.

How damages are apportioned, on the other hand, depends on the basis of each defendant's liability under Oklahoma law. If the tort is an intentional tort or simple negligence, each defendant who contributed to the indivisible harm is jointly and severally liable to plaintiff for all the damages resulting from that harm. *Boyles*, 619 P.2d at 617; *National Union Fire Ins. Co. v. A.A.R. Western Skyways, Inc.*, 784 P.2d 52, 55–56 (Okla.1989) (other than in comparative negligence cases, "joint and several liability with the right at common law of the plaintiff to recover all of his damages from any tortfeasor regardless of the degree of negligence that party contributed to the plaintiff's damages, continues to be the law."); *see also Gutowski v. City of New Britain*, 165 Conn. 50, 327 A.2d 552 (1973) (finding two officers jointly and severally liable for plaintiffs' injuries from intentional assault and battery). If, however, the tort is one of comparative negligence, each defendant's liability is several, *i.e.*, each defendant is liable for the portion of plaintiff's

damages that reflect the percentage of that defendant's comparative fault. *Bode,* 719 P.2d at 827–28 (finding in comparative negligence action, plaintiff who was found 9% liable could recover under comparative negligence statute, Okla. Stat. tit. 23, § 13, from defendant United States who was 1% liable because the combined negligence of tortfeasors United States and non-party employer was 91%).[28] Proof of causation, however, remains the same.

The Court recognizes that the legal lines between fault, causation, and harm are far from bright. However, what Poultry Defendants appear to be arguing is that plaintiffs have to show "factual causation." Comment b to the Restatement (Third) of Torts, Apportionment of Liability § 11, is helpful in explaining the distinction between apportionment of fault in several liability instances, such as comparative negligence cases, and factual causation:

> Historically, several liability was employed in situations where the plaintiff's injury was divisible according to the causal contributions of multiple defendants. This use of several liability imposed a burden of proof on plaintiff to demonstrate the portion of the injury caused by each defendant. Thus, factual causation was the basis for determining the several-liability portion of the plaintiff's injuries for which each defendant was liable. Nevertheless, in cases in which proof was unavailable or difficult to obtain, many courts adopted joint and several liability to relieve the plaintiff of the difficulties of proof.

Restatement (Third) of Torts, Apportionment of Liability § 11, cmt. b (2000). Under current comparative negligence principles, however, damages are not apportioned by factual causation but by fault: "'several liability' is widely employed and understood today to mean that a defendant is liable only for the proportionate share of plaintiff's indivisible injury determined by multiplying the comparative responsibility assigned to any defendant by the amount of plaintiff's damages." Restatement (Third) of Torts, Apportionment of Liability § 11, Reporters' Note to cmt. a (2000).

In this case, plaintiffs need not prove the portion or quantity of harm or damages caused by each particular defendant. Rather, plaintiffs must show that each defendant contributed to phosphorus loading in the Watershed and that the phosphorus in the Watershed has resulted in the harm and damages sustained by plaintiffs. Based on the record before the Court on summary judgment, causation is a question of fact for the jury. Accordingly, the Court denies defendants' motions for partial summary judgment based on causation.[29] (Dkt. ## 211, 232, 239, 216, and 240).

---

**28.** As is apparent from *Bode,* plaintiff was able to recover in a comparative negligence case from a defendant whose fault was less than that of plaintiff's because the combined negligence of defendants exceeded that of plaintiff's. Unlike joint and several liability cases, plaintiff's recovery from the less culpable defendant, however, was limited to the defendant's proportion of fault (in this case, 1% of plaintiff's damages). In answering yes to the certified question—"Whether a party plaintiff-tortfeasor who has been found to be nine percent (9%) negligent may recover against a party defendant found to have been one percent (1%) negligent"—the Oklahoma Supreme Court explained:

> The cornerstone of comparative negligence is founded on attaching liability in direct proportion to the fault of *each entity* whose negligence caused the damage . . . . The law is clear in Oklahoma that if a defendant's actions contributed to cause the injury, the defendant is liable even though his/her act or negligence *alone* might not have been a sufficient cause.

*Id.* at 827 (citations omitted) (emphasis added).

**29.** Separate defendant George's also argues that plaintiffs cannot establish a causal link

### 5. Plaintiffs' "Contributory Negligence"

■ Poultry Defendants seek partial summary judgment that they cannot be held jointly and severally liable for plaintiffs' negligence, negligence *per se* and nuisance claims because plaintiffs have also contributed to the phosphorus loading in the lakes. (Dkt. # 211). Since the filing of this motion, the Court permitted plaintiffs to dismiss their negligence-based claims. (Dkt. # 301). Plaintiffs' remaining common law claims are based on intentional tort theories of trespass and nuisance. As the Court noted above, liability of each defendant for intentional torts is joint and several. Poultry Defendants argue that they are nonetheless entitled to a contributory negligence defense as plaintiffs' nuisance claims are inherently based on negligence, citing Restatement (Second) of Torts § 840B(1) ("When a nuisance results from negligent conduct of the defendant, the contributory negligence of the plaintiff is a defense to the same extent as in other actions founded on negligence.").

First, the Court finds plaintiffs have stated a claim of nuisance which is intentional in nature. Restatement (Second) of Torts § 825 defines "Intentional Invasion" as follows:

> An invasion of another's interest in the use and enjoyment of land or an interference with the public right, is intentional if the actor
>
> (a) acts for the purpose of causing it, or

(b) knows that it is resulting or is substantially certain to result from his conduct.

Plaintiffs in essence are asserting that defendants knew an "invasion" of phosphorus in plaintiffs' and the public's use and enjoyment of the Water Supply was substantially certain to result from Poultry Defendants' growers' land application of litter and Decatur's WWTP effluent discharge, yet allowed this conduct to continue unabated. Whether or not the first "invasion" is intentional, "when the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional." Restatement (Second) of Torts § 825, cmt. d (1965); *Robinson v. City of Ashdown,* 301 Ark. 226, 783 S.W.2d 53, 56 (1990) ("when one knows that an invasion of another's interest in the use and enjoyment of land is substantially certain to result from one's conduct, the invasion is intentional."); *Cities Service Oil Co. v. Merritt,* 332 P.2d 677, 685 (Okla.1958) (Defendants' salt water pollution of creek which in turn polluted landowner's well constituted a continuing nuisance for which defendants were jointly and severally liable); *Frank v. Environmental Sanitation Management, Inc.,* 687 S.W.2d 876, 881–82 (Mo.1985) (finding a continuing intentional nuisance because "the jury had sufficient evidence to conclude defendant continued to operate the landfill after it knew of the leachate problem"). Similarly, plaintiffs are alleging a continuing intentional trespass claim.[30]

---

between land application of poultry litter and the alleged taste and odor episodes for which plaintiffs seek recovery. (Dkt. # 229). George's, however, failed to set forth any statements of undisputed fact or evidence to support this argument as required by Local Rule 56.1. In any case, there are genuine issues of material fact which preclude summary judgment on this basis.

**30.** Decatur correctly recognizes that a trespass can result simply from the intent to voluntarily commit an act which invades the property of another without any intent to harm. Prosser and Keeton, *The Law of Torts* § 13 (1984) ("The intent required as a basis for liability as a trespasser is simply an intent to be at the place on the land where the trespass allegedly occurred."). However, herein, plaintiffs are alleging knowledge of and intent to harm.

■ Second, although Poultry Defendants correctly recite the rule, under § 840B(1) of Restatement (Second) of Torts, that contributory (comparative) negligence is a defense to a nuisance claim based on negligence, § 840B(2) applies here: "When the harm is intentional, or the result of recklessness, contributory negligence is not a defense." *See also Whitlock v. Smith,* 297 Ark. 399, 762 S.W.2d 782, 783 (1989) (finding trial court correctly refused to give instruction on comparative fault as defense to battery); *Graham v. Keuchel,* 847 P.2d 342, 363 (Okla.1993) ("jury must be instructed that while ordinary negligence may be used as a defense against gross negligence, it may not be considered as a defense against any form of conduct found to be willful and wanton or intentional."); Oklahoma Uniform Jury Instruction (Civil), Instruction No. 9.17A.

"Tort law generally reflects two variables: the nature of the defendant's conduct and the nature of the plaintiff's injury." Restatement (Third) of Torts, Apportionment of Liability § 1, cmt. a (2000). The causation analysis in subsection (4) above turns on the latter, while the applicability of contributory negligence is fashioned by the former. Simply stated, "[t]he common law's rationale for refusing to apply contributory negligence to intentional torts was that conduct that gives rise to intentional tort liability is different in kind from plaintiff's contributory negligence." William J. McNichols, *Should Comparative Responsibility Ever Apply to Intentional Torts?*, 37 Okla. L.Rev. 641, 647 (1984). In his article, McNichols discusses contributory negligence in relation to nuisance:

> Some early cases indicated that contributory negligence is never a defense in nuisance. The modern view is that contributory negligence will be a defense if the underlying basis of nuisance is negligence. The position of the *Restatement (Second) of Torts* is that contributory

negligence is a defense to a nuisance based on negligence, but not to an intentional nuisance or one based on strict liability.

*Id.* at 669. Although McNichols argues comparative negligence should be an available defense in certain "intentional" torts, *e.g.,* in an intentional nuisance "where defendants intentionally invade plaintiff's legally protected interests but *do not intend the tangible harm that in fact results,*" he acknowledges that contributory negligence is not a defense to an intentional tort under the common law. *Id.* at 672.

As plaintiffs have dismissed their negligence-based claims, plaintiffs have deprived defendants of a contributory or comparative negligence defense. However, while this precludes any apportionment of damages to plaintiffs should they succeed in proving their intentional continuing nuisance and trespass claims, plaintiffs do risk forfeiting any recovery for failing to prove the necessary intent. In addition, the Court emphasizes that the loss of this defense (and the allocation of plaintiffs' fault) does not preclude evidence of plaintiffs' contribution to the phosphorus loading of the lakes, as such is relevant to defendants' proof of want of causation.

Based on the above, the Court denies Poultry Defendants' motion for summary judgment on contributory negligence. (Dkt. # 211).

**6. Damages for Inconvenience and Annoyance**

■ Poultry Defendants move for summary judgment that plaintiffs cannot recover damages for annoyance and inconvenience in their nuisance claims as these damages arise from injuries to the person, not the property, citing *Truelock v. City of Del City,* 967 P.2d 1183, 1187 (Okla.1998). They contend that entitlement to such damages requires a plaintiff to prove it has

in fact suffered annoyance or inconvenience, which an inanimate entity, such as a municipal corporation, cannot do. Such damages, therefore, are recoverable only by natural persons.

Annoyance and inconvenience caused by maintenance of a nuisance is a separate and distinct element of damages from those arising from injury to property. *Thompson v. Andover Oil Co.*, 691 P.2d 77, 83 (Okla.App.1984); *Oklahoma City v. Eylar*, 177 Okla. 616, 61 P.2d 649, 650 (O1936). Inconvenience and annoyance are injuries to the person and not to the property. *See Truelock*, 967 P.2d at 1187 (quoting *Oklahoma City v. Tytenicz*, 171 Okla. 519, 43 P.2d 747, 748–49 (1935)). However, it does not necessarily follow that only natural persons can recover damages for such injuries.

The Arkansas Supreme Court in *Gus Blass Dry Goods Co. v. Reinman & Wolfort*, 102 Ark. 287, 143 S.W. 1087 (1912), specifically held that a corporation may be entitled to such damages:

> a corporation may be entitled to the relief granted by a court of equity against the maintenance of a nuisance which renders physically uncomfortable and substantially diminishes the ordinary use, occupation, and enjoyment of its property by its employees, agents, and officers, whose presence and occupancy of its premises is necessary to the conduct of its affairs and business.

*Id.* at 1090. In so finding, the Court cited the case of *Baltimore & Potomac R.R. Co. v. Fifth Baptist Church*, 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739 (1883), which held:

> "Private corporations are but associations of individuals united for some common purpose, and permitted by the law to use a common name, and to change its members without a dissolution of the association. Whatever interferes with the comfortable use of their property, for the purposes of their formation, is as

much the subject of complaint as though the members were united by some other than a corporate tie."

*Gus Blass*, 143 S.W. at 1090–91; *see also Eylar*, 61 P.2d at 651 (citing *Fifth Baptist Church*) ("The plaintiff [Fifth Baptist Church] was entitled to recover because of the inconvenience and discomfort caused to the congregation assembled, thus necessarily tending to destroy the use of the building for the purposes for which it was erected and dedicated."). Neither Arkansas nor Oklahoma law therefore restricts recovery of these damages to natural persons.

It may well be that plaintiffs are seeking relief for injuries for which it makes no sense to attribute to a corporation. The Court lacks sufficient information as to the basis of plaintiffs' "annoyance" and/or "inconvenience" to determine whether damages for either are logically limited to natural persons. The Court, however, finds no legal limitation under the authorities cited by Poultry Defendants, and therefore, declines to hold such damages are not recoverable as a matter of law. Accordingly, the Court denies Poultry Defendants' motion regarding damages for annoyance and inconvenience. (Dkt. # 211)

**B. Decatur's Municipal Immunity Defense**

Section 21–9–301 of the Arkansas Code, entitled "Tort liability—Immunity declared" provides:

> It is declared to be the public policy of the State of Arkansas that all counties, *municipal corporations*, school districts, special improvement districts, and all other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies *shall be immune from liability and from suit for damages* except to the extent that they may be covered by

liability insurance. *No tort action shall lie against any such political subdivision because of the acts of its agents and employees.*

Ark.Code Ann. § 21–9–301 (2002) (emphasis added). Section 21–9–301, however, "does not provide immunity for the intentional acts of [municipal corporations] and their employees, only their negligent acts." *Deitsch v. Tillery,* 309 Ark. 401, 833 S.W.2d 760, 762 (1992); *Battle v. Harris,* 298 Ark. 241, 766 S.W.2d 431 (1989).

In its September 11, 2002 Order, the Court denied Decatur's motion to dismiss plaintiffs' claims of nuisance and trespass under Arkansas common law because plaintiffs alleged intentional torts of nuisance and trespass which were not subject to immunity under Ark.Code. Ann. § 21–9–301.[31] In its motion for summary judgment, Decatur continues to urge that it is entitled to immunity from plaintiffs' nuisance and trespass claims based on the following: (1) the Arkansas Supreme Court has found municipalities immune from trespass claims in *Chestnut v. Norwood,* ("*Chestnut*") 292 Ark. 498, 731 S.W.2d 200, 201 (1987) under § 21–9–301, and in *Chamberlain v. Newton County,* ("*Chamberlain*") 266 Ark. 516, 587 S.W.2d 4, 6 (1979) under § 21–9–301's predecessor statute; and (2) the only nuisance claims excepted from statutory immunity are those which constitute a taking by the municipality. *See Cabbiness v. City of North Little Rock,* 228 Ark. 356, 307 S.W.2d 529, 531 (1957); *Robinson v. City of Ashdown,* 301 Ark. 226, 783 S.W.2d 53 (1990); *Thompson v. City of Siloam Springs,* 333 Ark. 351, 969 S.W.2d 639, 642 (1998); *Sewer Improvement Dist. No. 1 of Sheridan v. Jones I ("Sheridan"),* 199 Ark. 534, 134 S.W.2d 551, 552–53 (1939); *Jones v. Sewer Improvement Dist. No. 3 of the City of Rogers ("Rogers"),* 119 Ark. 166, 177 S.W. 888, 889–91 (1915).

In *Chamberlain,* plaintiff sued Newton County in Chancery Court alleging that she was owner of land over which the county had constructed a roadway without her consent or grant. Plaintiff sought an injunction and damages for destruction to her property and costs of a survey. Newton County filed a third party complaint against the James, owners of property adjacent to plaintiff's land, alleging that it relied on the misrepresentation of the James that they were owners of the subject property and seeking reopening of another road and restoration of plaintiff's land. The chancery court entered a temporary order authorizing the county to open the old road, reciting the agreement of the county to place barricades at each end of the new road. Plaintiff then amended her complaint, joining the James and alleging that the county was "maintaining a nuisance" by failing to restore her land, and sought damages from the county and the James. The chancery court found that the county was immune from tort liability and dismissed plaintiff's complaint.

Plaintiff appealed, contending that the chancery court erred in determining that the plaintiff's amended complaint was a tort action as plaintiff had alleged a taking of her property. In affirming the chancery court's decision, the Arkansas Supreme Court held:

If [plaintiff's] action be taken as a suit for damages for trespass, the chancery court had no jurisdiction. An action for trespass is in tort. . . . The chancery court had no jurisdiction of such an action for two reasons. Equity will not take jurisdiction of an action to recover

---

**31.** The Court also noted that plaintiffs' claims for unjust enrichment and injunctive relief were not barred by the immunity statute.

unliquidated damages for tort.... The county is immune from suit for damages in a tort action. [citing Ark. Stat. Ann. § 12–2901 (Supp.1977), the predecessor statute to § 21–9–301].[32]

*Chamberlain,* 587 S.W.2d at 6 (other citations omitted). The Court found the chancery court had no jurisdiction because

> [plaintiff's] only remedy against Newton County was to file a claim in the County Court of Newton County for just compensation for a completed taking. Exclusive jurisdiction of [plaintiff's] claim for compensation is vested in the County Court of Newton County as a matter relating to county roads. Art.7, § 28, Constitution of Arkansas.[33] The county could not be sued to recover this compensation by inverse condemnation proceedings. [citing Ark. Stat. Ann. § 17–702 (1968) ].

*Id.* at 7.

In *Chestnut,* the Arkansas Supreme Court upheld the constitutionality of the former municipal immunity statute, Ark. Stat. Ann. § 12–2901 (1979), and the dismissal of plaintiffs' claim "in tort for negligence" against a county judge and road foreman for monetary "damages allegedly caused by diverting surface waters onto the appellants' lands" based on governmental immunity and lack of jurisdiction.[34] In so doing, the Court cited its earlier opinion in *Chamberlain:*

[W]e affirmed a lower court dismissal of a suit for damages for trespass by Newton County in allegedly causing a road to be constructed on lands belonging to Chamberlain. We pointed out that trespass was a tort and that the trial court had no jurisdiction.

731 S.W.2d at 201.

Neither of these decisions supports Decatur's immunity from the trespass claim alleged herein. Contrary to the facts in *Chestnut* and *Chamberlain,* plaintiffs are alleging an intent to "invade," "intrude upon," and "interfere with" the Water Supply, not a mistaken belief or negligence on the part of Decatur. Specifically, plaintiffs are alleging that Decatur intentionally continued its effluent discharge of phosphorus after it knew that the Water Supply would be harmed.

Similarly, the Court does not find an intentional nuisance claim is barred by the Arkansas municipal immunity statute. In *Robinson v. City of Ashdown,* 301 Ark. 226, 783 S.W.2d 53, 56 (1990), plaintiffs sued the city for negligence, nuisance and inverse condemnation for the repeated flooding of their house with raw sewage due to sewer back-up which continued over a nine-year period. The lower court directed a verdict against plaintiffs based on the city's immunity under § 21–9–301.

The question before the Arkansas Supreme Court was "whether instances of negligence, with respect to which the city

---

**32.** The former statute, Ark. Stat. Ann. § 12–2901 (Supp.1977), the predecessor statute to § 21–9–301, stated:

It is hereby declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other political subdivisions of the State shall be immune from liability for damages, and no tort action shall lie against any such political subdivision, on account of the acts of their agents and employees.

**33.** The Arkansas constitution grants "exclusive original jurisdiction" to county courts for "all matters relating to ... roads ... and every other case that may be necessary to the internal improvement and local concerns of the respective counties." Art. 7 § 28, Arkansas Constitution.

**34.** The Court specifically noted that it was not "denying recourse to [plaintiffs] for their damage, only the right to proceed in tort." *Id.* at 202

has immunity from suit, may, if sustained a long time, amount to inverse condemnation." *Id.* at 54. The Court held that "although injury to property through negligence or trespass does not, without more, qualify as a taking," [35] this case involved a "continuing trespass or nuisance [which] ripen[ed] into inverse condemnation." *Id.* at 55. Noting that "[c]ourts have used both nuisance and trespass theories to overcome the general rule that negligence does not result in inverse condemnation," *id.* at 55, the Court found the continued negligent acts of the city amounted to a taking because "when one knows that an invasion of another's interest in the use and enjoyment of land is substantially certain to result from one's conduct, the invasion is intentional." *Id.* at 56.

The Court, however, did not rely on § 21–9–301 in finding the city was not immune from suit in this instance. Rather, it relied on Ark. Const. Art. 2, § 22 [36] in concluding

> When a municipality acts in a manner which substantially diminishes the value of a landowner's land, and its actions are shown to be intentional, it cannot escape its constitutional obligation to compensate for a taking of property on the basis of its immunity from tort action.

*Id.* at 56–57.

The dissent took issue with the majority's holding as to the city's immunity from negligent acts under § 21–9–301:

This statute is unequivocal in its prohibition against *any* action sounding in negligence, whether based upon trespass or any other tort. Statutes granting immunity from tort liability to subdivisions of the state have been held constitutionally sound by this court. *Thompson v. Sanford,* 281 Ark. 365, 663 S.W.2d 932 (1984).

We are today holding that, solely as a result of a municipality's recurring acts of *negligent trespass, without a showing of any intent,* offended parties may elect to consider their property "taken" by the political subdivision. I do not agree that this holding is within the meaning or the spirit of the Arkansas Constitution, the acts of the General Assembly, or our prior decisions.

*Id.* at 57 (emphasis added). In so stating, the dissent distinguished the authority relied upon by the majority, *McLaughlin v. City of Hope,* 107 Ark. 442, 155 S.W. 910 (1913):

> The major distinction between *McLaughlin* and the present case relates to scienter. In *McLaughlin,* there was no negligence involved—the waste was discharged into the stream by the city *with knowledge, and the act was intentional.* Here, recurring acts of negligence were shown in the city's failure to adequately maintain a lift pump

**35.** The Court discussed the difference between inverse condemnation and eminent domain:

> As originally conceived and developed, the concept of inverse condemnation was a remedy for physical taking of private property without following eminent domain procedures. "Fault" has nothing to do with eminent domain, and it is *not bare trespass or negligence* which results in inverse condemnation but something which amounts to a de facto or common law "taking." . . . Inverse condemnation is thus a cause of

action against a governmental defendant to recover the value of property which has been taken in fact by a governmental entity although not through eminent domain procedures.

*Id.* at 53 (emphasis added).

**36.** Section 22 provides:

> The right of property is before and higher than any constitutional sanction and private property shall not be taken, appropriated or damaged for public use, without just compensation therefor.

to transport sewage away from the appellants' property. The appellants' proper remedy would have been an action to seek abatement of the nuisance instead of one for damages.

*Robinson*, 783 S.W.2d at 57 (emphasis added).

In *Thompson v. City of Siloam Springs*, 333 Ark. 351, 969 S.W.2d 639 (1998), plaintiffs brought suit against a municipality for claims for inverse condemnation, negligence, intentional acts and omissions, and violation of their federal civil rights for failing to respond to a fire and intentionally pulling down a wall of their sale barn. The trial court granted the city's summary judgment motion, finding plaintiffs' negligence claims were barred by § 21–9–301 and plaintiffs had failed to show an intentional taking by the City.

On appeal, plaintiffs did not challenge the trial court's ruling that their negligence claim was barred by § 21–9–301; rather, they contended there was a fact question as to whether the city's acts were intentional and amounting to a taking. In affirming the trial court's ruling, the Arkansas Supreme Court distinguished the facts in the case from those in *Robinson* and *National By–Products, Inc. v. City of Little Rock*, 323 Ark. 619, 916 S.W.2d 745 (1996),[37] in the lack of evidence of malice or intentional acts and failure to show substantial reduction in the value of their property. "While these facts would present a jury question on the issue of negligence, [plaintiffs] have not appealed the trial court's ruling that a claim of negli-

gence is barred by § 21–9–301." *Id.* at 642.

In *Cabbiness v. City of North Little Rock*, 228 Ark. 356, 307 S.W.2d 529 (1957), the question before the Arkansas Supreme Court on appeal was whether the City or the Boys' Club was liable for a nuisance claim based on injuries sustained by plaintiff in a pool which was leased by the City to the Boys' Club.

The Court first determined the allegations were negligence-based.

Appellant lays great stress on the allegations in the complaint to the effect that the City had constructed and leased to the Boy's Club a *nuisance*, and that the Boy's Club had maintained such *nuisance*. Appellant claims that *maintaining a nuisance* is entirely different from an *act of negligence*. Of course, there is a distinction between nuisance and negligence. See 65 C.J.S. Negligence §§ 1, p. 316; 66 C.J.S. Nuisances §§ 6, p. 736; and 66 C.J.S. Nuisances §§ 11, p. 751. But when we view the situation realistically in the case at bar, there are really questions of (a) whether the City was negligent in constructing the pool, and (b) whether the Boys' Club was negligent in failing to provide warnings as to the depth of the pool. Absent, as here, any eminent domain question of damage to property by the construction of a nuisance, the proper procedure for an aggrieved person is to sue to abate the nuisance, rather than to sue the municipality in tort.

**37.** *National By–Products, Inc. v. City of Little Rock*, 323 Ark. 619, 916 S.W.2d 745 (1996), did not involve the immunity statute. Rather, the Arkansas Supreme Court upheld the dismissal of an inverse condemnation claim. The Court interpreted Art. 2, § 22 of the Arkansas Constitution as requiring "compensation for a taking when a municipality acts in a manner which substantially diminishes the

value of a landowner's land, and its actions are shown to be intentional." *Id.* at 747. The Court cited *Robinson*, saying that "a taking occurs when a condemnor acts in a manner which substantially diminishes the value of a landowner's land, and that a continuing trespass or nuisance could ripen into inverse condemnation." *Id.*

*Id.* at 531 (emphasis added). The Court also held the city could not be held liable because it was acting in a governmental rather than proprietary capacity in owning the swimming pool. *Id.* at 532–33.

*Sheridan* and *Jones* simply stand for the following proposition: "neither municipal corporations nor local improvement districts nor their officers may be sued at law for tort; but it does not follow that in a proper case they may not be enjoined from creating a nuisance or be required to abate one already created by them." *Sheridan,* 134 S.W.2d at 554; *Jones,* 177 S.W. at 891.

■■■ The common law recognizes "a nuisance may be found from a continuous, known invasion, where after complaint and notice of damage, the land owner continues to offend and refuses to correct or discontinue the misuse." *Fletcher v. City of Independence,* 708 S.W.2d 158, 166 (Mo.Ct. App.1986). Not one of the above cases refutes this common law theory that a nuisance can be an intentional tort. As the Court found in its earlier Orders, nuisance claims can be based on negligent or intentional conduct. It is the nature of the municipality's alleged conduct which determines whether immunity applies. Whether or not cast as inverse condemnation, *Robinson* supports that negligent acts can give rise to an intentional invasion after notice and complaint.

Arkansas law clearly excepts intentional torts from the municipal immunity statute. In *Deitsch v. Tillery,* 309 Ark. 401, 833 S.W.2d 760 (1992), plaintiffs brought claims of the tort of outrage, negligence, and liability under 42 U.S.C. § 1983 against the school district, its employees and the local school board members alleging defendants knew the elementary school contained friable asbestos and failed to correct the conditions and protect the children. The trial court dismissed the outrage and § 1983 claim for failure to state a claim and the negligence claim based on defendants' statutory immunity under § 21–9–301. The Supreme Court affirmed the dismissal of the § 1983 and negligence claims and reversed the dismissal of the outrage claim.

The Court noted that plaintiffs alleged defendants were *aware* of the asbestos and the regulations requiring removal, and had *intentionally* violated the regulations, which violation rose to the level of outrage.

> By definition, the tort of outrage, also know as the intentional infliction of emotional distress . . . is an intentional tort. [Plaintiffs] are correct that Section 21–9–301 does not provide immunity for the intentional acts of school districts and their employees, only their negligent acts.

*Id.* at 762 (citation omitted).

Similarly, in *Battle v. Harris,* 298 Ark. 241, 766 S.W.2d 431 (1989), the Arkansas Supreme Court reversed the lower court's dismissal of plaintiffs' suit for damages against the sheriff for the wrongful taking and sale of personal property seized on a writ of execution rejecting the sheriff's reliance on immunity from tort liability under § 21–9–301. Taking the facts alleged in plaintiffs' complaint as true, the Court held that plaintiff stated a claim of intentional tort and therefore suit could not be dismissed based on municipal immunity.

> [A]lthough we have held that the public officials named under § 21–9–301 are immune from tort liability, *viz.,* negligent acts committed in the performance of their official duties, *Autry v. Lawrence,* 286 Ark. 501, 696 S.W.2d 315 (1985), we have never interpreted that immunity to include intentional torts committed by those officials. We reject any suggestion to do so now.

*Id.* at 433. *See also West Memphis School Dist. No. 4 of Crittenden County v. Circuit Court of Crittenden County,* 316 Ark. 290, 871 S.W.2d 368, 371 (1994)(denying writ of prohibition to preclude court from asserting jurisdiction over county board members and finding lower court correctly recognized "the intentional actions by board members are not protected by statutory immunity."); *Waire v. Joseph,* 308 Ark. 528, 825 S.W.2d 594 (1992)(Section 21–9–301 does not provide immunity for intentional acts, only negligent acts.).

The Court notes that Decatur is not urging it is entitled to summary judgment based on immunity because plaintiffs have not met and cannot meet their evidentiary burden in proving intentional conduct. Rather, it is continuing to argue that plaintiffs cannot state a claim of trespass or nuisance based on intentional conduct under Arkansas law. The Court disagrees. Decatur's motion to find as a matter of law that plaintiff's cannot state intentional torts of trespass or nuisance is denied. (Dkt. # 240).

## C. Common Law Claims against Peterson for its Pretreatment Discharge

█ Based on the allegations set forth in the First Amended Complaint, Peterson asserts it is entitled to judgment as a matter of law that neither its conduct nor activities associated with its discharge into Decatur's WWTP is actionable under federal or Arkansas law. Specifically, Peterson argues plaintiffs cannot hold it liable under CERCLA[38] or Arkansas common law for the following reasons: (1) it is not required under the CWA to obtain a NPDES permit to discharge into the WWTP; (2) its participation in and/or financial contribution to the design, engineering and construction of the WWTP is not a violation of federal or Arkansas law; (3) its knowledge of the WWTP's treatment process is irrelevant as Decatur's discharge into Columbia Hollow Creek is not in violation of its NPDES permit; and (4) the alleged impairment of the beneficial use of the lakes is not due to a violation of federal or Arkansas law by the "joint discharge" of Peterson and Decatur, as Decatur's NPDES permit does not impose any limits on the discharge of phosphorus.

The Court denies Peterson's motion for "judgment on the pleadings." What Peterson is in essence arguing is plaintiffs cannot bring common law claims against it for a *joint* effluent discharge of phosphorus from Decatur's WWTP because the NPDES permitting system under the CWA preempts any common law liability based on the discharge of phosphorus. Peterson is correct that there is no NPDES restriction on Decatur's WWTP's discharge of phosphorus. However, as the Court recognized in its September 11, 2002 Order denying Decatur's motion to dismiss on similar grounds (and in its October 28, 2002 Order denying Decatur's motion to certify), "nothing in the [CWA] bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* state.... [T]his authority may include the right to impose higher common-law as well as higher statutory restrictions." *International Paper Co. v. Ouellette,* 479 U.S. 481, 497, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). The United States Supreme Court in *Ouellette* expressly recognized the source state's right to impose separate "standards" through its nuisance laws which "create some tension with the permit system." *Id.* at 499;, 107 S.Ct. 805 *see also Stoddard v. Western Carolina Re-*

---

**38.** As noted above, although plaintiffs and Peterson apparently assume plaintiffs have brought a CERCLA claim against Peterson for the effluent discharge from Decatur's WWTP, the Court finds no such claim in the First Amended Complaint.

*gional Sewer Auth.*, 784 F.2d 1200 (4th Cir.1986) (CWA does not preempt state regulation and common law remedy awarded riparian landowners for taking of their property due to sewage discharge); *Union Oil Co. of California v. Heinsohn*, 43 F.3d 500, 504 (10th Cir.1994) ("Licensing is not in itself enough to avoid liability [for nuisance]."). Therefore, should plaintiffs prove Peterson and Decatur jointly and intentionally discharged levels of phosphorus which interfered with the use and enjoyment of the Water Supply, a "higher common law" standard would necessarily be imposed. Peterson's motion under Arkansas law is denied.

### D. Unjust Enrichment

██ Decatur and Poultry Defendants move for partial summary judgment that they have received no benefit from any service performed or cost incurred by plaintiffs to establish an unjust enrichment claim under Oklahoma or Arkansas law. Defendants contend plaintiffs' expenditures with respect to the Water Supply have not added to any property owned by defendants or saved any expense defendants were obligated to incur; therefore, any action plaintiffs have taken to improve their own Water Supply benefits only plaintiffs.

Plaintiffs argue that defendants received the benefit of not incurring costs to haul their poultry litter out of the Watershed and to remove excess phosphorus from the Decatur WWTP, having instead passed on the expense to plaintiffs for the cleanup of the resulting contamination of the Water Supply. Plaintiffs estimate that during the time period from 1997–2002, they have benefitted Poultry Defendants in the amount of $16,893,312 for their failure to remove poultry litter from the Watershed and saved Decatur and Peterson

$2,969,558 and $2,985,840, respectively, for water treatment costs.

██ Under Oklahoma and Arkansas law, plaintiff must show "enrichment to another coupled with a resulting injustice" to recover under a theory of unjust enrichment. *Teel v. Public Serv. Co. of Oklahoma*, 767 P.2d 391, 398 (Okla.1985); *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1518 (10th Cir.1991) (applying Oklahoma law); *Dews v. Halliburton Indus., Inc.*, 288 Ark. 532, 708 S.W.2d 67, 69 (1986) ("To find unjust enrichment, a party must have received something of value, to which he was not entitled and which he must restore. There must also be some operative act, intent, or situation to make the enrichment unjust and compensable."); *Sparks Regional Medical Ctr. v. Blatt*, 55 Ark.App. 311, 935 S.W.2d 304, 307 (1997) (same). To establish entitlement, plaintiff must at a minimum show "either an expenditure adding to the property of another or one that 'saves the other from expense or loss.'" *Tinney*, 933 F.2d at 1518 (quoting *McBride v. Bridges*, 202 Okla. 508, 215 P.2d 830, 832 (1950)); *Sparks*, 935 S.W.2d at 307 ("The courts will imply a promise to pay for services only where they were rendered in such circumstances as authorized the party performing them to entertain a reasonable expectation of their payment by the party beneficiary.").

What plaintiffs are seeking in this case are damages and injunctive relief for injury to the Water Supply which allegedly resulted from defendants' practices. In other words, plaintiffs are seeking to prove that defendants have caused the contamination of the Water Supply in violation of the law and that plaintiffs are therefore entitled to recover damages for that injury and abate the practices which caused the injury. However, for plaintiffs to rely on the doctrine of unjust enrichment, an obligation which plaintiffs seek to prove would

have to be assumed: that is, defendants *should* have prevented the contamination of the Water Supply by incurring the expense of hauling the poultry litter out of the Watershed and treating the wastewater at Decatur's WWTP to reduce the level of phosphorus. The ill fit of this theory is particularly apparent in plaintiffs seeking recovery of costs they have not incurred. Plaintiffs have not hauled the poultry litter from the Watershed or treated Decatur's wastewater. Rather, plaintiffs have incurred costs from the treatment of the water from the lakes, which they now seek to recover in damages. Damages and/or injunctive relief is the appropriate remedy in this case, not restitution. Accordingly, the Court grants Decatur's and Poultry Defendants' motion for summary judgment on plaintiffs' unjust enrichment claims. (Dkt. ## 211 and 240).

### E. Unclean Hands

■■■ Decatur contends plaintiffs are barred from injunctive relief by the equitable doctrine of unclean hands: "[e]quity will not intervene on behalf of a plaintiff whose conduct in connection with the same matter has been unconscientious or unjust." *Merchants & Planters Bank & Trust Co. of Arkadelphia v. Massey*, 302 Ark. 421, 790 S.W.2d 889, 891 (1990). Decatur cites plaintiffs' discharge of wastewater from its treatment plants into the Arkansas River, from the Eucha Sewer Lagoons into Lake Eucha from 1972 through 1983, and the occasions from 1983 through 1991 in which plaintiffs siphoned or decanted sewage from the lagoons to the lake.

Plaintiffs assert the equitable doctrine of unclean hands does not apply, as the alleged misconduct of plaintiffs does not arise out of and is not related to the same subject matter of plaintiffs' claims against the defendants. *Houston Oilers, Inc. v. Neely*, 361 F.2d 36, 42 (10th Cir.1966) (Under Oklahoma law, "equity will not in any manner aid a party whose conduct in relation to the litigation matter has been unlawful, unconscionable, or inequitable."). They assert that there is no relationship between plaintiffs' discharge into the Arkansas River watershed and Decatur's discharge into the Eucha/Spavinaw watershed, and that plaintiffs' operation of the wastewater treatment lagoons at Eucha State Park occurred 25 years ago. Further, plaintiffs contend Decatur's phosphorus loading to plaintiffs' water supply is estimated at 10 tons/year since the 1960s, whereas the estimated volume from the Eucha State Park lagoons is undetectable.

As the "maxim [of unclean hands] admits of the free exercise of judicial discretion in the furtherance of justice," *id.* at 42, and the relatedness of the parties' contribution of phosphorus to the Water Supply is in dispute, the Court denies the motion for summary judgment and reserves ruling until it hears all the evidence and addresses plaintiffs' claim for injunctive relief.

### VI. CONCLUSION

In accordance with the above, **IT IS HEREBY ORDERED** that:

Dkt. # 211 Poultry Defendants Motion for Summary Judgment or in the Alternative for Partial Summary Judgment and Integrated Original Brief in Support is **granted in part and denied in part;**

Dkt. # 216 Separate Defendant Simmons Foods Inc.'s Motion for Summary Judgment is **denied;**

Dkt. # 219 [Peterson's] Motion for Summary Judgment is **denied;**

Dkt. # 225 Plaintiffs' Motion and Brief for Partial Summary Judgment Against Poultry Defendants on Issue of Liability for Growers' Disposal of Poultry Manure is **granted in part and denied in part;**

Dkt. # 226 Plaintiffs' Motion and Brief for Partial Summary Judgment Against Poultry Defendants on Issue of Liability Under CERCLA is **denied;**

Dkt. # 229 Separate Defendant George's Inc.'s Motion for Summary Judgment is **denied;**

Dkt. # 232 Separate Defendant Tyson Foods, Inc.'s Motion and Integrated Brief in Support of Summary Judgment is **denied;**

Dkt. # 238 Motion of Separate Defendant Cargill Inc's and Brief in Support of Supplemental Motion for Partial Summary Judgment is **denied;**

Dkt. # 239 Separate Defendant Cobb–Vantress Inc.'s Motion and Integrated Brief in Support of Summary Judgment is **denied;**

Dkt. # 240 Defendant City of Decatur's Motion for Summary Judgment and Brief in Support is **granted in part and denied in part;** and

Dkt. # 255 Poultry Defendants' ... Motion and Brief to Strike Plaintiffs' Motion and Brief for Partial Summary Judgment Against Poultry Defendants is **denied.**